166 P.3d 322

STATE of Hawai'i, Respondent/Plaintiff–
Appellee/Cross–Appellant,

v.

Ijeva MATAVALE, Petitioner/Defendant–
Appellant/Cross–Appellee.

No. 27476.

Supreme Court of Hawai'i.

Aug. 14, 2007.

As Corrected Sept. 14, 2007.

James Tabe (Katie L. Lambert and Deborah L. Kim, on the briefs), Deputy Public Defenders, for petitioner-appellant.

Stephen K. Tsushima (also on the brief), Deputy Prosecuting Attorney, for respondent-appellee.

MOON, C.J., and LEVINSON, J.; ACOBA, J., concurring; NAKAYAMA, J., dissenting, with whom DUFFY, J., joins.

Opinion of the Court by MOON, C.J.[1]

On December 21, 2006, we accepted petitioner/defendant-appellant/cross-appellee Ijeva Matavale's (Mother) timely application for writ of certiorari (application), filed on November 27, 2006, requesting that this court review the August 29, 2006 judgment of the Intermediate Court of Appeals (ICA), entered pursuant to the August 15, 2006 summary disposition order. Therein, the ICA affirmed the Family Court of the First Circuit's[2] August 5, 2005 judgment, convicting Mother of and sentencing her for the offense of abuse of family or household members, in violation of Hawai'i Revised Statutes (HRS) § 709–906 (Supp.2005).[3]

In her application, Mother argues that the ICA gravely erred in affirming her conviction inasmuch as: (1) insufficient evidence was adduced to rebut her parental justification defense under HRS § 703–309(1) (1993), quoted *infra;* and (2) the trial court erred in instructing the jury to continue deliberations and directing the jury to a previously-promulgated instruction on how to go about in its deliberations, after the jury had indicated that it was deadlocked. Respondent/plaintiff-appellee/cross-appellant State of Hawai'i (the prosecution) did not file a response to Mother's application.

For the reasons discussed below, we vacate the ICA's August 29, 2006 judgment and reverse the trial court's August 5, 2005 judgment of conviction and sentence.

## I. BACKGROUND

### A. The Trial

On April 25, 2005, Mother was charged by way of complaint with one count of abuse of family or household members, in violation of HRS § 709–906, for "intentionally, knowingly or recklessly [causing] physical[ ] abuse" to her fourteen-year-old daughter [hereinafter, Daughter]. A jury trial commenced on August 2, 2005 and lasted three days, until August 4, 2005. The following evidence was adduced at trial.

Daughter testified that, at the time of the incident on April 15, 2005, she was fourteen years old and living with Mother, her stepfather, and five siblings. Daughter was attending Castle High School and was in the fourth and final quarter of her freshman year. In the first two quarters of Daughter's freshman year, she was receiving low grades, including two Fs. As a result, Daughter and Mother discussed what was causing the low grades and how Daughter was going to improve them, to which Daughter "suggested [that she] should go to tutoring," and Mother agreed. Daughter began attending the tutoring classes three times a week at the end of January. However, by February, Daughter was only attending the class once a week and started to "hang out" with her friends at the mall. By March, Daughter attended tutoring classes "[n]ot as much" and "only when [she] needed help with a specific item." Daughter was not keeping up with her homework and continued to "hang out" with her friends at the mall.

Nonetheless, Daughter led Mother to believe that she was attending tutoring classes through February and March. Specifically, Daughter testified that:

> Q. [By Defense Counsel:] During this period of time when you stopped going to tutoring, [*i.e.,* the month of *February,*] you told your mom that you were still going to tutoring?
>
> A. [By Daughter:] Yes.
>
> . . . .

---

1. It should be noted that, although the dissent characterizes this opinion as "the plurality," the concurring opinion clearly agrees with the analysis regarding the first issue discussed herein. Thus, the first issue has been decided by a "majority."

2. The Honorable Patrick W. Border presided over the underlying proceedings.

3. HRS § 709–906 provides in relevant part that "[i]t shall be unlawful for any person, singly or in concert, to physically abuse a family or household member[.]"

Q. Okay.... And during this time in *March* you were still telling your mom that you were going to tutoring?

A. Yes.

(Emphasis added.) The third quarter ended after spring break in March. At the beginning of April, Mother began to question Daughter as to when she would be getting her report card for the third quarter, to which Daughter responded that she was unsure as to the date. Mother testified that:

> ... I reminded her from Monday[, *i.e.,* April 11, 2005,] "Don't forget your report card. You know I'm looking forward to see[ing] these grades come up."
>
> ....
>
> I was looking forward because of her request to go to tutoring. As a mom, I want to see those grades [go] up for her[.]

On Friday, April 15, 2005 (the date of the incident), Daughter received her report card and found that she "didn't do too well." Daughter, thus, "purposely left [her report card] in school" even though she knew that Mother was waiting for her grades. That afternoon, Mother picked Daughter up from school, along with her brothers and sisters who were talking about their report cards, in the family van. Mother drove to Kaneohe Elementary School, where she and Daughter waited in the parking lot while the other children attended Kumon (*i.e.,* tutoring) classes. Mother remained seated in the driver's seat, and Daughter sat diagonally behind her in the second row seat of the van. While waiting in the van, Mother asked to see Daughter's report card, and Daughter answered that she forgot it at school. Mother testified that, at that moment,

> [i]n my mind[, I was thinking] how could you[, *i.e.,* Daughter,] forget all along. I've asked [her], you know. I reminded [her] on Monday. I reminded her again on Wednesday, and Friday came.
>
> ....
>
> I'm sitting in the driver's seat. I'm thinking, "How could this be? How could you forget the report card?"
>
> ....
>
> So then I ask[ed] her again, "How could you forget your report card, [Daughter]?

You know I'm looking forward to seeing you—your grades."

> ....
>
> [Daughter] didn't respond right away. I say, "So tell me where is your report card?" "At school." "Where at school?" "In my social studies textbook."
>
> ....
>
> [At] that moment[,] I tried to put two and two together. So I'm saying—so, I ... asked her ... "You purposely left it there?" And then she didn't say anything.
>
> ....
>
> So I told her, "Please tell me the truth. I want you to touch base with me[.]"

Mother stated that Daughter eventually told her the truth, and, at Mother's request, Daughter wrote her grades down on a piece of paper, indicating that she received "four C's, one D and one I," *i.e.,* an incomplete. Mother testified that she was "very worried" because she "didn't know if [Daughter] was going to pass [her classes] or not."

Mother began questioning Daughter as to why there had been no improvement of her low grades. Daughter refused to answer. Daughter's testimony reveals why she refused to answer Mother's questions:

Q. [By Defense Counsel:] Okay. And at first you don't answer her[,] right?

A. [By Daughter:] No.

Q. Okay. Um, mom is asking you for answers and you're not answering her?

A. Yes.

Q. Okay. Um, seems like mom's getting a little bit frustrated?

A. Um-hmm. Yes.

Q. Okay. Um, and is it disrespectful not to answer mom?

A. Yeah.

Q. So mom is asking you now, um, because you're stalling, "Are you lying to me?"

A. Yes.

Q. Okay. And were you in fact lying to her?

A. Yes.

Q. Okay. So mom asks you, "What about the tutoring?" Right?

A. Yes.

Q. Okay. And—and you told her that you were still going to tutoring[,] right?

A. Yes.

Q. .... You weren't answering her immediately every time she asked you a question[,] right?

A. No.

Q. Okay. You were kind of stalling?

A. Yes.

Q. Okay. Um, stalling for a long period of time?

A. Yes.

Q. Okay. Because you didn't want to answer her?

A. Yes.

Q. Okay. Um, and that's when mom disciplines you[,] right?

A. Yes.

According to Daughter, because Daughter was sitting diagonally behind Mother in the van, Mother could not reach Daughter easily and used a plastic backpack (belonging to Mother's younger daughter), which was about sixteen inches by twelve inches in size and contained a school folder and a jacket, to hit Daughter. Daughter, however, used her left arm to block the backpack. Mother testified that she was trying to hit Daughter's leg in order to get her attention: "I'm aiming to her to respond to me. 'Come on. You're not—you're not, um, touching base with me.'"

Mother continued to demand to know whether Daughter had been attending the tutoring classes, to which Daughter finally answered "no." Mother then demanded to know where Daughter had been going instead. Daughter refused to answer, and, thus, Mother tried to hit her with a plastic hanger, aiming at Daughter's thigh. Mother testified that she began hitting Daughter with the hanger because Daughter "wasn't responding" to her questions. Each time, Daughter blocked the hanger with her left arm. Daughter estimated that she was hit approximately five times on the left forearm and upper arm.

Daughter finally told Mother that she had been hanging out with her friends at the mall instead of going to the tutoring classes. At this point, Mother "got more frustrated," "thought that [Daughter] was dishonest," and "felt deceived." Mother picked up a "small car brush," which was about four or five inches long, and hit Daughter once on the top of her left hand with the flat side of the brush. Mother then hit Daughter once on the knuckles with "the plastic handle" of an unspecified tool. Mother indicated that she believed she had "to teach [her] daughter a lesson, to get back on the right track." Mother testified that:

I didn't know it was—it was wrong, but I did it for a purpose. I just wanted the best for my daughter. I felt that she was going off the wrong track. Um, I felt that she needed to get back on the right path. Um, I don't know her whereabouts to where she say, I don't know who she made contact with. I felt that she was taking the risk of, um, complacence.

. . . .

. . . I'm a 24/7 mom, I support—I support my kids a hundred percent. Um, I just wanted the best for [Daughter] and-because, um, this school year was coming close to an end. Um, I just wanted her— and hopefully that she would pass this grade.

Daughter testified that, on the date of the incident, her left "arm was red and . . . had . . . a few markings from the hanger." Daughter further described the markings as "just lines" and "small . . . like the size of a pencil [line]" with "tiny spots of purplish-greenish." When asked whether Daughter "could . . . tell from the way that [M]other was hitting [her] how hard she was hitting[,]" Daughter responded "not that hard, but it did cause me pain." With respect to the level of pain experienced upon being hit with the various implements, Daughter specifically testified:

Q. [By the Prosecutor:] Okay. Uh, so let's talk about first when [Mother] was hitting you with the backpack. Did that hurt?

A. [By Daughter:] Um-hmm. When it hit my arm, it stinged, but after, no.

Q. Okay. On a scale from one to ten, uh, one being didn't really feel it, ten being

very painful, how painful would you say that was?

A. The backpack?

Q. *The backpack.*

A. Mmm, *two, three.*

Q. Okay. Moving on to the plastic hanger, uh, did—when [Mother] hit you with *the plastic hanger,* you said four—five times?

... Did that hurt?

A. Um, at that point, yes.

Q. And, uh, on a scale from one to ten, how painful was that?

A. Mmm, *four, five.*

Q. Okay. Um, *the car brush.* You said—you testified [that Mother] hit you on the hand with that. Did that hurt?

A. *No.*

Q. *It didn't hurt?*

A. *No.*

Q. Okay. And what about the, uh, *the tool?*

A. *Mmm, not really.*

(Emphases added.) Daughter also stated that she was (at the time of trial on August 2, 2005) 5′4″ or 5′5″ and weighed about 150 or 154 pounds. When asked whether Mother was taller, heavier, and stronger than she, Daughter responded affirmatively.

As previously indicated, the incident occurred on a Friday afternoon. That night, Daughter performed her normal household chores, *i.e.,* helping to cook dinner and washing the dishes. On Saturday, Daughter went to a family luʻau; on Sunday, she went to a family gathering/dinner at her grandmother's house. On Monday, Daughter asked Mother whether she was going to school, to which Mother indicated in the negative after looking at Daughter's left arm. On Tuesday and Wednesday, Mother let Daughter decide whether she was going to attend school, and Daughter decided to stay home.

On Thursday, April 21, 2005 (six days after the incident), Daughter decided to return to school. Apparently, a teacher or counselor spoke with Daughter, which led to the police being called to the school. Honolulu Police Department (HPD) Officer Darryl Lee responded to the call from the school. He testified that he "met with [a Castle High School] staff [member, who] took [him to see Daughter] and ... instructed [him] that [Daughter] had visible injuries and ... that she was abused by her mother." Officer Lee related that, upon meeting Daughter, he "asked her if she had any injuries. She said that she had bruises on her forearms—on her left forearm. And so I looked at the injuries and asked her how she got it, and she said it was from her mother." He then proceeded to take two photographs of Daughter's left arm, which photographs were admitted into evidence as State's Exhibits 1 (picture of Daughter's left arm) and 2 (a close-up picture of Daughter's left forearm). Officer Lee identified State's Exhibits 1 and 2 as accurately representing the injuries he observed on April 21, 2005. When asked by the prosecution whether he noticed anything in the State's Exhibit 2, Officer Lee responded "[t]he bruise on her, um, left shoulder area." On cross-examination, however, Officer Lee testified to the following:

Q. [By Defense Counsel:] ... [Y]ou didn't actually see any, uh, yelling, screaming, any kind of incident?

A. [By Officer Lee:] No. I—I didn't witness the abuse.

Q. Okay. Um, and—let's see. You took photos of the injuries that you did see?

A. Yes.

Q. Okay. And you didn't see any other injuries?

A. No.

Q. Like no abrasions?

A. No.

Q. No welts?

A. No.

Q. No scratches?

A. No.

Q. Okay. No fractures?

A. No.

Q. Okay. Um, and, um, when you met with [Daughter], uh, she wasn't crying?

A. Not at the time.

Q. Okay. Um, she wasn't angry?

A. Uh, no.

Q. Okay. She wasn't hysterical?

A. No.

Q. Okay. Um, and you offered to get her medical attention?

A. Yes.

Q. She refused?

A. Yes.

With regard to the two photographs taken by Officer Lee, the prosecution questioned Daughter as follows:

Q. [By the Prosecutor:] Looking at State's Exhibit 2, [Daughter], what are we looking at here?

A. [By Daughter:] Um, my upper arm.

Q. Okay. And, um, at about right in the center of—almost the center of State's Exhibit 2, there seems to be some redness and discoloration. What are we looking at there?

A. Um, right here?

Q. Yes.

A. Um, a small bruise.

Q. And below that, to the lower portion of State's Exhibit 2, there seems to be another similar marking. What are we looking at?

A. The same.

Q. "The same" meaning another small bruise?

A. Yeah.

Q. ... [L]ooking at pictures—uh, *the markings on your arm in State's Exhibits 1 and 2, you said that they were small bruises at the time. Is that how they looked on April 15[, 2005 (the date of the incident) ]?*

A. *Yes.*

Q. *They looked—that's exactly the way they looked on April 15th?*

A. *Mmm, there was a little color, but you could barely see it.*

Q. *So there was more color?*

A. *A little.*

(Emphases added.) In addition, Neil Nishikawa, a social worker employed at Child Protective Services (CPS), who was assigned to investigate the circumstances surrounding the incident, testified that:

[B]asically, [Mother] said that, uh, she—she, um, was talking with [Daughter] about school, that, um, she was—that the nature I guess of the conversation created a lot of stress, and she just lost it for a moment and she hit the girl. Um, she has since apologized. She has since, um—and I've talked to the girl, and the girl also feels safe at home, so we didn't pursue the case at that point.

Further, when asked by defense counsel whether his decision not to remove Daughter from Mother's home was based upon his finding that the home was safe and that Daughter was safe being with Mother, Nishikawa answered in the affirmative.

Mother was also asked about her meeting with Nishikawa. Specifically, Mother testified:

Q. [By the Prosecutor:] You admitted to [Nishikawa] that you felt sorry for what you did on the 15th; isn't that right?

A. [By Mother:] I—I admittedly, um, told him that what I did, it-it hurts me to do that to my daughter.

Q. Now did you have any bruises—

A. Excuse me.

Q. —from that day?

A. No. It hurts me, my feelings, not physically.

Q. Okay. And you felt sorry; right?

A. It hurt me that I had to take that route to teach my daughter a lesson.

Q. You had to take that route?

A. I have tried other options. Didn't work. I don't think it did.

Q. ... And Mr. Nishikawa testified that you told him that it was a stressful situation which you admitted you were frustrated; correct?

A. I was frustrated.

Q. Okay. And then you lost control a little bit. That's what you told Mr. Nishikawa, isn't it?

A. Uh, I lost a little control. I—yes, I did tell Mr. Nishikawa that I lost control, but to teach my daughter a lesson, to get back on the right track. . . .

B. *The Deliberation and Verdict*

At the close of the defense's case on August 3, 2005, the trial court gave the jury general instructions, including the instruction contained on page 16 of the jury instructions, which reads:

> A verdict must represent the considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous.
>
> Each of you must decide the case for yourself, but it is your duty to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violating your individual judgment. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest belief as to the weight or effect of evidence for the mere purpose of returning a verdict.

The trial court further instructed the jury on the elements of the offense of abuse of family or household members, as contained in HRS § 709–906, and the parental justification defense in HRS § 703–309(1).

On the same day, after closing arguments, the jury deliberated for two hours before being excused for the day. After less than three hours of deliberation on the next day, August 4, 2005, the jury sent "Communication No. 1," stating: "We are in a deadlock decision. What next?" The trial court's proposed response—"Continue your deliberations. See page 16 of the instructions"—was objected to by the prosecution. The prosecution, relying on *State v. Fajardo*, 67 Haw. 593, 699 P.2d 20 (1985), believed that the more proper response was "Would more time assist you in ... reaching a unanimous ver-

dict?" Defense counsel, on the other hand, objected to any response, contending that the jury had indicated a final position that they were deadlocked. Nevertheless, the trial court instructed the jury as proposed, *i.e.*, "Continue your deliberations. See page 16 of the jury instructions." Approximately two hours later, the jury indicated that it had reached a verdict, finding Mother guilty as charged.

On August 5, 2005, before sentencing, Mother renewed her motion for judgment of acquittal,[4] which was denied. Mother then moved for a mistrial, arguing that:

> Your Honor, this is in response to the communication number one from the jury which indicated that, um, they were in a deadlock decision. Defense objects to the court's instructions because ... it amounted to an *Allen* instruction [[5]] which gave the jury an impression that the deadlock was not an appropriate outcome to this case, and we believed that no further response was necessary.

The trial court denied the motion for a mistrial and imposed sentence of two years probation with two days' imprisonment. The judgment of conviction and sentence was entered that same day, August 5, 2005. On September 1, 2005, Mother timely filed a notice of appeal.[6]

C. *Appeal Before the ICA*

On appeal, Mother raised two points of error, to wit: (1) the trial court erred in convicting her because the prosecution failed to prove beyond a reasonable doubt that Mother's discipline of Daughter was not immunized by the parental justification defense codified in HRS § 703–309(1); and (2) it was reversible error for the trial court to instruct the jury to continue with its deliberations

4. At the close of the prosecution's case-in-chief, Mother had orally moved for a judgment of acquittal, which motion was denied.

5. An *Allen* instruction "is traditionally understood as an instruction to work towards unanimity by considering the views of others when a jury has reached an impasse in its deliberations." *Rodriguez v. Marshall*, 125 F.3d 739, 750 (9th Cir.1997) (citation omitted), *overruled in part on other grounds, Payton v. Woodford*, 299 F.3d 815 (9th Cir.2002). The case that gives the instruc-

tion its name is *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). This court specifically rejected the use of the *Allen* instruction in *Fajardo*. 67 Haw. at 601, 699 P.2d at 25.

6. On September 13, 2005, the prosecution filed its notice of cross-appeal, challenging the trial court's order pertaining to bail pending appeal. However, the issue is not before this court.

after it had declared it could not reach a unanimous verdict. On August 15, 2006, the ICA issued its summary disposition order, affirming the trial court's August 5, 2005 judgment and sentence. Specifically, the ICA resolved Mother's points of error as follows:

1. [Mother] contends the [prosecution] adduced insufficient evidence at trial to disprove her parental [justification] defense. This point lacks merit. There was substantial evidence to support the jury's verdict. *State v. Eastman*, 81 Hawai'i 131, 135, 139, 913 P.2d 57, 61, 65 (1996).

2. For her other point of error on appeal, [Mother] contends the [trial] court committed "reversible error" by instructing the jury to continue deliberations and directing the jury to a previously-promulgated instruction on how to go about its deliberations, after the jury had indicated it was hung. We disagree.

First, a plain reading does not reasonably raise the inference that the instruction "directed the jury to matters outside the evidence presented," [Mother's] Opening Brief at 32, or "implicitly led the jury to believe it was held hostage by the court until a verdict was agreed on." *Id.* at 16. *Cf. State v. Villeza*, 72 Haw. 327, 335, 817 P.2d 1054, 1058 (1991) ("it was error for the trial court to instruct the jury that it must unanimously decide that it was unable to reach a verdict").

Second, the instruction cannot be reasonably interpreted as "a subtle form of the *Allen* charge[.]" Opening Brief at 33. *Cf. State v. Fajardo*, 67 Haw. 593, 600–01, 699 P.2d 20, 24–25 (1985) (error to give the jury an *Allen* charge—that a deadlock means the case must be retried, and that minority jurors should reconsider in light of their status as such).

Finally, the [trial] court's response to the jury's report of deadlock was consonant with the relevant case law. "Had the trial court simply repeated an instruction given earlier to the jury on how to go

about its deliberations, we feel that no prejudicial effect would have befallen [Mother]." *Id.* at 601, 699 P.2d at 25 (footnote omitted). *See also Villeza*, 72 Haw. at 335, 817 P.2d at 1058–59 ("when the jury advised the court that it was unable to reach a verdict, the trial court properly exercised its discretion in determining that the jury might not be 'deadlocked' and by providing the jury with a complete set of the jury instructions").

"The instructions, when considered as a whole, were not prejudicially insufficient, erroneous, inconsistent, or misleading," *id.* at 333, 817 P.2d at 1057 (citations omitted), and thus the [trial] court properly fulfilled its "obligation to exercise its broad discretion to obtain a verdict from the jury." *Id.* at 333, 817 P.2d at 1058 (citation omitted).

(Original brackets omitted.) Subsequently, on August 29, 2006, the ICA entered its judgment on appeal. Mother timely filed her application on November 27, 2006, which this court granted on December 21, 2006.[7] Oral argument was held on April 24, 2007.

## II. STANDARDS OF REVIEW

### A. Writ of Certiorari

This court reviews the decision of the ICA for (1) grave errors of law or of fact or (2) obvious inconsistencies in the decision of the ICA with that of the supreme court, federal decisions, or its own decisions. HRS § 602–59(b) (Supp.2006).

### B. Sufficiency of Evidence

 We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial

---

7. We permitted the parties to file supplemental briefs on the sole issue "whether the [trial c]ourt committed reversible error when it instructed the jury to continue deliberations and directed the jury to a previously-promulgated instruction after

the jury had indicated that it was deadlocked." Mother filed a supplemental brief, which expanded on the argument expressed in her application, on February 20, 2007. The prosecution did not file a supplemental brief.

evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable [a person] of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

*State v. Batson*, 73 Haw. 236, 248–49, 831 P.2d 924, 931 (1992) (citations omitted).

## III. *DISCUSSION*

As previously stated, Mother maintains that the ICA gravely erred in affirming the judgment of conviction and sentence where: (1) there was insufficient evidence to prove beyond a reasonable doubt that Mother's conduct was not justified as parental discipline; and (2) the trial court issued what amounted to an *Allen* instruction after receiving a communication from the jury that it was deadlocked.

### A. *Sufficiency of Evidence and the Parental Justification Defense*

Mother does not dispute that she used physical force upon Daughter. However, Mother contends that the evidence proffered by the prosecution was legally insufficient to disprove her defense of parental discipline. As such, Mother believes that her conviction for abuse of family or household members was not supported by sufficient evidence. We agree with Mother.

■ Preliminarily, we recognize that "an appellate court will not overturn a conviction by a jury if 'viewing the evidence in the light most favorable to the [prosecution], there is substantial evidence to support the conclusion of the trier of fact.'" *State v. Moniz*, 92 Hawai'i 472, 992 P.2d 741 (App.1999), *cert. denied*, 92 Hawai'i 472, 992 P.2d 741 (1999) (quoting *State v. Matias*, 74 Haw. 197, 207,

840 P.2d 374, 379 (1992)). However, this court has, on numerous occasions,

reversed a defendant's conviction *because the jury's verdict was not supported by legally sufficient evidence as a matter of law. See, e.g., State v. Balanza*, 93 Hawai'i 279, 288, 1 P.3d 281, 290 (2000); *State v. Bautista*, 86 Hawai'i 207, 214, 948 P.2d 1048, 1055 (1997); *State v. Malufau*, 80 Hawai'i 126, 133, 906 P.2d 612, 619, *vacated in part on other grounds*, 80 Hawai'i 126, 906 P.2d 612 (1995); *State v. Lucks*, 56 Haw. 129, 132, 531 P.2d 855, 858 (1975).

*State v. Jones*, 96 Hawai'i 161, 180, 29 P.3d 351, 370 (2001) (emphasis added).

■ We begin our analysis with the well-established principle that "parental rights are of constitutional dimension." *In re Doe*, 99 Hawai'i 522, 532, 57 P.3d 447, 457 (2002). A parent's right to direct his or her child's upbringing has found protection in both the federal and Hawai'i constitutions. *See id.* at 532–33, 57 P.3d at 457–58; *Wisconsin v. Yoder*, 406 U.S. 205, 213–15, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *but see Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1391 (9th Cir. 1997) (although a parent has a privilege to use reasonable or moderate physical force to control behavior, there is no absolute constitutional right to strike a child). The state, however, in the interest of protecting the child's welfare, has a right to limit parental freedom in raising their children. *Prince v. Massachusetts*, 321 U.S. 158, 165–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944). To this end, our legislature has carved out a law, *i.e.*, HRS § 703–309(1), recognizing a parent's privilege to exercise physical control over a child so long as it does not result in harm to the child. As originally enacted, HRS § 703–309(1) (1985) provided that:

The use of force upon or toward the person of another is justifiable under the following circumstances:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the

request of such parent, guardian, or other responsible person, and:

(a) *The force is used for the purpose of safeguarding or promoting the welfare of the minor, including the* prevention or *punishment of his misconduct;* and

(b) *The force used is not designed to* cause or known *to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation.*

(Emphases added.) The commentary to HRS § 703–309(1) indicated that the statute "sets a fairly simple and unexceptionable standard; the right of parents to use force to discipline their children is recognized, *subject to clear requirements not to cause permanent injury.*" (Emphasis added.) Moreover, HRS § 703–309(1) (1985) is derived from and is identical to section § 3.08(1) of the Model Penal Code. *Compare* HRS § 703–309(1) *with* Model Penal Code § 3.08(1) (1985); *see generally* Conf. Comm. Rep. No. 1, in 1972 House Journal, at 1035, and in 1972 Senate Journal, at 734. Specifically, the drafters of the Model Penal Code set forth the following comments regarding section 3.08(1):

> *The formulation is in some respects less stringent than that in Section 147 of the Restatement of Torts, which speaks of "such reasonable force" and "such reasonable confinement" as the parent "reasonably believes to be necessary for" the "proper control, training, or education" of the child.*[8] To require belief in necessity to avoid criminal conviction was thought to be too extreme. Parents may defensibly use force less on the basis of a judgment of necessity than simply with the belief that it is an appropriate preventive or corrective measure. Hence, *so long as the person exercising parental authority acts for the purpose of safeguarding or promoting the child's welfare (including the specific purpose of preventing or punishing misconduct), he is privileged under the Model Code unless he culpably creates substantial risk of the excessive injuries specified in Subsection (1)(b).*
>
> *The formulation also differs from the Restatement in not explicitly demanding that the force be reasonable.* It was believed that so long as a parent uses moderate force for permissible purposes, the criminal law should not provide for review of the reasonableness of the parent's judgment. Of course, even if a statute includes language about necessity or reasonableness or both, it would be extraordinary for a parent using moderate force for a permissible purpose to be prosecuted because of misjudgment.
>
> Thus[,] the less stringent language of the Model Code is unlikely to make a great practical difference, but it does more accurately reflect the latitude that is actually given to judgments of parents in disciplining their children.

*State v. Kaimimoku*, 9 Haw.App. 345, 351–52, 841 P.2d 1076, 1079–80 (1992) (quoting Model Penal Code § 3.08, Comment (1979)) (format altered) (some emphases added) (some emphases omitted). In other words, the original HRS § 703–309(1) granted "to parents considerable autonomy to discipline their children, and[,] as long as parents use moderate force for permissible purposes in disciplining their children and do not create a substantial risk of the excessive injuries specified in subsection (1)(b), they will not be criminally liable." *Id.* at 352, 841 P.2d at 1080.

In *Kaimimoku*, the trial court found the defendant-father's use of force against his seventeen-year-old daughter unjustified un-

---

**8.** Restatement (Second) of Torts § 147 (1965) provides that:

(1) A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his child as he reasonably believes to be necessary for its proper control, training, or education.

(2) One other than a parent who has been given by law or has voluntarily assumed in whole or in part the function of controlling, training, or educating a child, is privileged to apply such reasonable force or to impose such reasonable confinement as he reasonably believes to be necessary for its proper control, training, or education, except in so far as the parent has restricted the privilege of one whom he has entrusted the child.

der HRS § 703–309(1) (1985) and convicted the father of abuse of a family or household member. 9 Haw.App. at 348, 841 P.2d at 1078. In that case, the father slapped his daughter on the face and punched her shoulder, leaving a scratch and a bruise, and causing some pain of unknown duration. *Id.* at 347–48, 841 P.2d at 1077. The father testified that he used force on his daughter to punish her for yelling profanities at him, disobeying him, and being disrespectful. *Id.* at 352, 841 P.2d at 1080. The daughter admitted that she yelled profanities at her father and did not obey him when he told her not to do so. *Id.*

In reversing the father's conviction, the ICA determined that the elements of the parental justification defense contained in HRS § 703–309(1) (1985) had been met, to wit: (1) the father was undisputedly the parent of the daughter; (2) "[t]here [was] no evidence on the record that [the f]ather struck [his d]aughter for any purpose other than for punishment"; and (3) the force used was "not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation." *Id.* at 352, 841 P.2d at 1080 (internal quotation marks and citation omitted). In reaching its conclusion that the force used was within the bounds afforded to the father as a parent, the ICA relied upon *State v. Deleon,* 72 Haw. 241, 813 P.2d 1382 (1991).

In *Deleon,* the defendant-father was convicted of abuse of family or household members upon the trial court's finding that he was guilty of causing "extreme pain," a prohibited result under HRS § 703–309(1)(b) (1985), when he struck his fourteen-year-old daughter with a folded belt. *Id.* at 242, 813 P.2d at 1383. The undisputed facts revealed that:

> The daughter testified that her father told her every day not to have her friends to the house. Even so, [the daughter's] friends were usually there when [the father] came home from work. [The father] had told [the daughter] that if she violated the house rules, he would spank her with a belt. Nevertheless, according to her testi-

mony, she deliberately brought her friends home every day.

> On the day in question, [the father] heard [the daughter] and her friends in the house and a girl was crying. Three friends were with [the daughter] in her room. [The father] called [the daughter] out of her room and asked what happened to [her friend who was crying]. He got no satisfactory answer. He told [the daughter's] friends to go home but they refused. At this point, *[the father] hit [the daughter] from six to ten times, with a crisscross motion, on her stretch pants, above the knees, with a 36–inch long belt, folded in two. The belt was one and one-half inches wide. [The daughter] testified that she felt a little pain, that the spanking stung her, and that the pain lasted an hour and a half. She had bruises for about a week. She cried for half an hour. . . .*

> . . . .

> The police officer testified that[,] at 6:00 p.m., he checked [the daughter's] legs and parts of her body for injuries. He found *some reddish, welt-type, raised skin above [the daughter's] knee joints.* The raised skin area was about three to three and a half inches wide and about four and a half to five inches long. . . . *The injuries at the time of the inspection were turning from red to darker grey or blue.*

*Id.* at 242–43, 813 P.2d at 1383 (emphases added). We reversed the father's conviction, concluding that the pain inflicted upon the daughter by her father did not "come, in degree, anywhere near death, serious bodily injury, disfigurement, extreme mental distress or gross degradation." *Id.* at 244, 813 P.2d at 1384. In so concluding, we employed "the ancient canon of construction," *noscitur a sociis, i.e.,* that "the meaning of words or phrases in a statute may be determined by reference to the meaning of words or phrases associated with it," *State v. Crouser,* 81 Hawai'i 5, 13 n. 6, 911 P.2d 725, 733 n. 6 (1996), to interpret the phrase "extreme pain" by examining the other statutorily prohibited results under HRS § 703–309(1)(b).

In 1992, the legislature, in considering an amendment to HRS § 703–309(1) (1985), expressly recognized—through the adoption of

a standing committee report by the Senate Judiciary Committee—that

> the line between physical abuse and appropriate parental discipline is a very subjective one. What one parent considers discipline may seem abusive to another. *Your Committee had to consider how best to draw the line in the context of the legal defense provided for parents* [and] guardians . . . when determining guilt in a criminal trial. *Your Committee believes that the "gray areas" must be resolved by not criminalizing such parental discipline, even if a majority of the community would find the extent of the punishment inappropriate.*

Sen. Stand. Comm. Rep. No. 2493, in 1992 Senate Journal, at 1121 (emphases added). In its attempt to best "draw the line," the legislature amended HRS § 703–309(1) (1985) to include the following underscored new language in subsections (1)(a) and (1)(b) and to remove the terms "death" and "gross degradation" from subsection (1)(b):

> The use of force upon or toward the person of another is justifiable under the following circumstances:
>
> (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
>
> (a) The force is *employed with due regard for the age and size of the minor and is reasonably related to the* purpose of safeguarding or promoting the welfare of the minor, including the prevention or *punishment of the minor's misconduct;* and
>
> (b) The force used is not designed to cause or known to create a risk of causing *substantial* bodily injury, disfigurement, extreme pain or mental distress, or *neurological damage.*

9. "Substantial bodily injury" is defined as bodily injury which causes:
(1) A major avulsion, laceration, or penetration of the skin;
(2) A burn of at least second degree severity;
(3) A bone fracture;

(Emphases added.) *See* 1992 Haw. Sess. L. Act 210, § 1 at 554.

The legislature indicated that the purpose of the aforementioned amendments was "to limit the *amount of force* that parents and guardians can legally use in disciplining their children to that which is *reasonable or moderate.*" Sen. Stand. Comm. Rep. No. 2208, in 1992 Senate Journal, at 1022 (internal quotation marks omitted) (emphases added); Conf. Comm. Rep. No. 103, in 1992 House Journal, at 843. The amendments also brought the subject statute "much closer to the formulation found in the Restatement (Second) of Torts § 147[, *see supra* note 8,] and that used by a substantial majority of other jurisdictions." *State v. Crouser,* 81 Hawai'i 5, 12, 911 P.2d 725, 732 (1996) (citation omitted). As the conference committee report regarding the amendments makes clear, the amendment to *subparagraph (a)* of subsection (1) was

> intended to further clarify the *level of force* one may use upon minors[.] In determining whether or not the *level of force* is permitted under law, a court must consider the age and size of the recipient and whether a reasonable relationship exists between *the force used* and a legitimate purpose as specified in the statute.

Conf. Comm. Rep. No. 103, in 1992 Senate Journal, at 783 (emphases added). Also, according to the Senate Judiciary Committee, the amendment to *subparagraph (b)* of subsection (1) was intended to lower the standard of harm

> by lowering the level of risk, and *reducing the permissible level of injury to that which is less than "substantial"* as defined in section 707–700 of the Hawai'i Penal Code.[9] While the permissible level of injury may still appear high, it is clearly a lower and more appropriate threshold.
>
> By using terms in the Hawai'i Penal Code, your Committee believes that *the standard is clearer for both the police and the public to understand and follow.*

(4) A serious concussion; or
(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.
HRS § 707–700 (Supp.2006).

Sen. Stand. Comm. Rep. No. 2208, in 1992 Senate Journal, at 1022–23 (emphases added). The legislature, nevertheless, opined that "the terms retained from the prior law ... must be reinterpreted by the courts, since the changes affect the application of the rule of construction applied in [*Deleon*]." Sen. Stand. Comm. Rep. No. 2493, in 1992 Senate Journal, at 1121. However, the legislature expressly indicated that "the changes [were] not intended to create a standard under which the result in *Deleon* would have been different. *The force* used by the father in *Deleon*, as described in the decision, *did not exceed the permissible force under the new language.*" *Id.* (emphases added).[10]

In 1996, this court, in *Crouser*, was called upon to apply the amended statute for the first time. In affirming the defendant's conviction, we concluded, *inter alia*, that the force used exceeded the permissible level of discipline under the statute. *Crouser*, 81 Hawai'i at 12–13, 911 P.2d at 732–33. The undisputed facts revealed that the fourteen-year-old complainant, who was a special education student, lived with her mother and her mother's boyfriend (the defendant). *Id.* at 8, 911 P.2d at 728. The complainant was required by her mother and the defendant to bring home a daily progress report signed by her teachers. *Id.* However, on the day of the incident, the complainant forgot to pick up the report from her counselor for her teachers to sign. *Id.* She apparently used an old report and changed some of the grades and her attendance record. *Id.* Upon learning of the complainant's action, the defendant went to the complainant's bedroom and

called her a liar and hit her across both sides of her face, knocking her to the floor. As she was trying to get up, [the defendant] grabbed her and threw her face down on the bed. According to the [complainant's] testimony, [the defendant] put his knee on [the complainant's] back, pulled her pants and underwear down to her knees, and started "whacking" her bare buttocks. When [the defendant] left the room, [the complainant] pulled up her underwear and pants, but [the defendant] returned with a plastic bat and closed the door. He again pulled down [her] pants and underwear and struck her with the bat on the buttocks, arm, thighs, and torso until the bat broke. [The complainant] could not remember the number of times that she had been struck, but testified that the incident lasted approximately thirty minutes.

*Id.* The complainant testified that she had a hard time sitting and felt dizzy for an hour or so, and her bottom hurt for a couple of weeks after the incident. *Id.* She further stated that she could not sit on a hard student chair at school and stood in some of her classes. *Id.* The school counselor and the health aide both testified that the complainant's buttocks were bruised and colored a deep reddish-purple. *Id.* at 8, 911 P.2d at 729.

We initially declared that, to invoke the parental justification defense under the amended HRS § 703–309(1), the defendant

was required to make a showing that the record contained evidence supporting the following elements: (1) he [or she] was a parent, guardian, or other person as de-

---

10. In an attempt to distinguish *Deleon* and *Kaimimoku* from the instant case, the dissent asserts that,

> while the corporal punishments in *Deleon* [ (hitting Daughter above the knees six to ten times with a folded belt) ] and *Kaimimoku* [ (a slap in the face and a punch in the shoulder) ] were obviously not designed to cause or create a known risk of causing "death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation," HRS § 703–309(1)(b)(1985), **neither this court in *Deleon*, nor the ICA in *Kaimimoku*, commented as to whether such punishments complied with the greater limitations imposed on parental discipline by [the 1992 amendment, *i.e.*,] HRS § 703–309(1)(b) (1993).**

Dissenting Op. at 176–77, 166 P.3d at 349–50 (bold emphasis added). We note, however, that *Deleon* was decided in 1991—obviously, before the 1992 amendment was even considered by the legislature. It is, therefore, inconceivable that this court could or would comment on an amendment that had not yet been passed. Moreover, although *Kaimimoku* was decided by the ICA six months after the effective date of the 1992 amendment, the 1985 version of the parental justification defense controlled inasmuch as the incident giving rise to the offense charged in that case occurred on February 13, *1991*. 9 Haw.App. at 346, 841 P.2d at 1077. Consequently, any comment by the ICA as to the inapplicable amendment would have been dicta.

scribed in HRS § 703–309(1); (2) he [or she] used force against a minor for whose care and supervision he [or she] was responsible; (3) his [or her] use of force was with due regard to the age and size of the recipient and reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of misconduct; and (4) the force used was not designed to cause, or known to create a risk of causing, substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

*Id.* at 10–11, 911 P.2d at 730–31 (citations and footnote omitted). We also stated that:

> Although we have found no other statute employing the identical language [contained in the current version of HRS § 703–309(1)(a) ], it seems clear that to be "reasonably related" to the purpose of punishing misconduct, *use of force must be both reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient.* · Subsection (b) of HRS § 703–309(1) defines the maximum degree of force that is justifiable under the statute. Subsection (a), as amended, makes clear that physical discipline may be so excessive that it is no longer reasonably related to safeguarding the welfare of the minor, even if it does not exceed the bounds set in subsection (b).

*Id.* at 12, 911 P.2d at 732 (emphasis added).

Upon considering, *inter alia,* (1) the age and size of the complainant, (2) testimony that the force was excessive and caused the complainant to be unable to sit in her classes, and (3) the nature of the injuries, we held that the force used by the defendant was not reasonably related to protecting the complainant's welfare. *Id.* at 12, 911 P.2d at 732. We further held that the force inflicted upon the complainant exceeded the permissible level of discipline. *Id.* at 12–13, 911 P.2d at 732–33. As we explained,

> [i]nterpreting "extreme pain" *noscitur a sociis* with substantial bodily injury, [as defined in HRS § 707–700, *see supra* note 9,] we believe[d the complainant's] pain was comparable in degree to the other statutorily forbidden results, such as a laceration of the skin or a burn of second degree severity.... *[T]he testimony in this case was that [the complainant] was in extreme pain for days and unable to sit without pain for weeks.*

*Id.* at 13, 911 P.2d at 733 (emphasis added). Moreover, we rejected the defendant's assertion that HRS § 703–309(1) is void for vagueness because the subject statute "describes, with sufficient clarity, the level of force that may justifiably be used in the discipline of a minor," stating that:

> Society recognizes the primary role of parents in preparing children to assume the obligations and responsibilities of adulthood, and it is well-established that parents have a privilege to subject children to reasonable corporal punishment. On the other hand, child abuse is a serious and widespread problem, and the state has a powerful interest in preventing and deterring the battering of children. Section 703–309(1) represents the balance struck by the legislature between these competing interests.

*Id.* at 14, 911 P.2d at 734 (citation omitted).

In *State v. Stocker,* 90 Hawai'i 85, 976 P.2d 399 (1999), we revisited the *Crouser* court's interpretation of the phrase "reasonably related" and declined to overrule *Crouser. Id.* at 94, 976 P.2d at 408. In *Stocker,* the defendant-father was convicted of harassment for slapping his eleven-year-old son across the face when the son refused to obey the father's repeated instruction to come to him. *Id.* at 88, 976 P.2d at 402. In reviewing the evidence in *Stocker,* namely, the son's testimony that (1) his father slapped him as a result of his failure to come to him after several commands and (2) the fact that the slap was (a) "with an open hand," (b) "didn't hurt ... only hurt a little bit," and (c) left no mark or bruise, this court concluded that a "single, mild slap to the face" was reasonably proportional to the son's misconduct. *Id.* at 96, 976 P.2d at 410 (ellipsis in original) (brackets and internal quotation marks omitted). We, thus, reversed the father's conviction, concluding that the prosecution failed, as a matter of law, to negate the father's parental justification defense. *Id.* at 95–96,

976 P.2d at 409–10. We further indicated that, although *"the legislature's 1992 amendments to HRS § 703–309(1)* accorded the courts greater leeway to determine the parameters of permissible parental discipline, they *did not eradicate a parent's prerogative to apply mild force to punish a child's minor misconduct."* *Id.* at 96, 976 P.2d at 410 (emphases added).

In contrast, the ICA in *State v. Tanielu*, 82 Hawai'i 373, 922 P.2d 986 (App.1996), agreed with the trial court that the "viciousness of the attack [the] defendant was involved in severed any relationship between the use of force and the welfare of [the d]aughter which might be considered 'reasonable.' " *Id.* at 381, 922 P.2d at 994 (some internal quotation marks omitted). In that case, the defendant kicked his fourteen-year-old daughter in the shin, slapped her six to seven times, punched her in the face five to ten times, stomped on her face, and pulled her ears after discovering that she, *inter alia*, violated his orders not to see her verbally and physically abusive eighteen-year-old boyfriend. *Id.* at 376–77, 922 P.2d at 989–90. The ICA held that, based on the number and nature of the slaps, punches, and kicks inflicted upon the daughter and the police officer's observation of the daughter's lacerations and contusions, the family court did not err in rejecting the parental justification defense. *Id.; see also State v. Miller*, 105 Hawai'i 394, 98 P.3d 265 (App.2004) (holding that the punching in the face and the multiple kicking in the ribs of an eleven-year-old complainant, as well as evidence of bleeding on the head and scratches to the facial area and ears, were clearly not reasonably related to the purpose of safeguarding or promoting the welfare of the complainant).[11]

In the present case, the critical inquiry is whether the prosecution presented sufficient evidence to negate Mother's defense of parental discipline. We believe the prosecution has not done so.

 When a question of parental discipline is raised, the prosecution must prove beyond a reasonable doubt that the parent's—here, Mother's—conduct did not come within the scope of parental discipline as prescribed in HRS § 703–309(1). *See Crouser*, 81 Hawai'i at 11, 911 P.2d at 731 ("the prosecution had the burden of disproving beyond a reasonable doubt the justification evidence that was adduced, or proving beyond a reasonable doubt facts negativing the justification defense") (citation omitted). As previously discussed, the legislature, in creating the parental justification defense law, recognized the right of parents to discipline their children; that right, however, is not absolute. In other words, parents may be justified in physically disciplining their children, but such discipline must be with due regard as to the amount of force utilized and must be directed to promote the welfare of the child. *The force used* must (1) reasonably be proportional to the misconduct being punished and (2) reasonably be believed necessary to protect the welfare of the recipient. *See id.* at 10–12, 911 P.2d at 730–32. The means used to effect the discipline must also be reasonable. In determining whether force is reasonable, the fact finder must consider the child's age, the child's stature, and the nature of the injuries inflicted, *i.e.*, whether *the force used* was designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage given the child's age and size. These required factors are obviously general in na-

11. The dissent believes that *Crouser, Miller*, and *Tanielu* "provide little assistance in determining whether the corporal punishment delivered by Mother is insufficient to constitute abuse as a matter of law" because those cases "do not establish the minimum degree of punishment that will constitute abuse[.]" Dissenting op. at 175, 166 P.3d at 348. Although, as stated *infra*, each case involving the alleged abuse of a child must be reviewed on a case-by-case basis, the aforementioned cases not only provide guidance in understanding the evolution and interpretation of HRS § 703–309(1), but also serve to illustrate the kind of conduct that clearly falls outside the parameters of parental discipline. On the other hand, *Stocker*—a case decided after the 1992 amendment—demonstrates the other side of the spectrum, *i.e.*, the type of conduct that falls within the parameters of parental discipline. As discussed more fully *infra*, the facts of this case, in our view, dictate that the force used by Mother was not so excessive as to exceed the boundaries of parental discipline.

ture and, by their very terms, place a large amount of discretion with the courts to determine whether the actions of a parent fall within the parameters of parental discipline, as set forth in HRS § 703–309(1). Clearly, there is no bright line that dictates what, under all circumstances, is unreasonable or excessive corporal punishment. Rather, the *permissible degree of force* will vary according to the child's physique and age, the misconduct of the child, the nature of the discipline, and all the surrounding circumstances. It necessarily follows that the question of reasonableness or excessiveness of physical punishment given a child by a parent is determined on a case-by-case basis and is dependent upon the particular circumstances of the case.

■ Here, the uncontroverted evidence demonstrates that Daughter had been lying to Mother for about two and a half months, telling Mother she was attending her tutoring classes when, in fact, she was hanging out at the mall with her friends without supervision. Daughter lied to Mother about forgetting her report card at school when, in fact, she "purposely" left her report card at school because of her low grades. Daughter repeatedly refused to answer Mother's questions concerning her report card, the reasons for the grades not improving, and whether she was attending her tutoring classes. Given these circumstances, it would not be unreasonable for a parent in Mother's position to conclude that Daughter needed disciplining for lying to, misleading, and disrespecting her mother. Indeed, as Mother testified, she was "frustrated" and "felt deceived" by Daughter's dishonesty and believed she had "to teach [her] daughter a lesson, to get back on the right track."

With regard to the child's age and size, the evidence reveals that, at the time of the incident, on April 15, 2005 (a Friday), Daughter was fourteen years old; her height and weight were unknown. At the time of trial, which commenced on August 2, 2005—less than four months later, Daughter was 5′4″ or 5′5″ and weighed approximately 150 or 154

pounds. Daughter testified at trial that Mother was taller, heavier, and stronger than she.

With regard to the type and amount of force used by Mother and the nature of Daughter's injury, the record reveals that: (1) Mother used a plastic backpack to hit Daughter because Daughter refused to answer Mother's questions concerning Daughter's report card; (2) Mother tried to hit Daughter on the thigh with a plastic hanger, but instead hit Daughter's left arm about five times, when Daughter refused to answer Mother's questions as to her whereabouts during the time she was supposedly at her tutoring classes; and, (3) upon learning of Daughter's activities, Mother hit Daughter once in the hand with the flat side of a "small car brush" and once in the knuckles with "the plastic handle" of a tool. According to Daughter, Mother was not hitting her hard, testifying that, on a scale of one to ten with ten being "very painful," being hit by (1) the backpack was a two or three, (2) the plastic hanger was a four or five, (3) the flat side of the car brush did not hurt, and (4) the plastic handle of the tool also did "not really" hurt. Consequently, Daughter's left arm was "red and ... had ... a few markings from the hanger[,]" which markings were "just lines"—"small ... like the size of a pencil [line]" with "tiny spots of purplish-greenish." Officer Lee observed "[t]he bruise on her ... left shoulder area[,]" but did not notice any abrasions, welts, or scratches on Daughter.[12] Daughter herself testified that the two photographs of her left arm (State's Exhibits 1 and 2) showed only "small bruises," and that, on the date of the incident, her injuries were exactly as shown in the photographs, except with "a little color, but you could barely see it."

Considering the totality of the facts and circumstances, we believe that the force employed by Mother was reasonably proportionate to the Daughter's defiant behavior towards her mother and was reasonably believed to be necessary to discipline Daughter and that the force used was "not designed to

---

12. Indeed, had Officer Lee suspected that any of Daughter's injuries might include "fractures" (which, obviously, are undetectable without an x-

ray), he surely would not have acquiesced when she declined medical treatment.

cause or known to create substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage." HRS § 703–309(1)(b). As stated above, Daughter testified that, although she experienced some pain at the time of the incident, Mother was not hitting her hard. In fact, Daughter indicated that, out of the four implements used by Mother, two of them (the flat side of the car brush and the plastic handle of the tool) did not hurt or did "not really" hurt and the other two (the backpack and the plastic hanger) only hurt between levels two to five (on a scale of one to ten with ten being "very painful"). In addition, unlike *Crouser*, in which the minor was unable to sit at school for days as a result of a severe beating to the buttocks area, or *Tanielu*, in which the minor received numerous punches, kicks, and slaps to the face and shin area, resulting in lacerations, or *Miller*, in which the minor received multiples kicks and punches to the face and ribs, resulting in scratches and bleeding, Daughter's injuries in this case consisted of a few small bruises that were visible for about a week. No evidence was adduced that the bruises required medical attention. In fact, Officer Lee offered to get Daughter medical attention, but Daughter refused medical help. Likewise, there is no evidence to indicate any detriment to Daughter's overall well-being or physical, emotional or psychological state. *See* HRS § 703–309(1)(b). The evidence indicated that Daughter was able to tend to her normal household chores on the night of the incident, as well as attend a family lu'au on Saturday (the day after the incident) and a family gathering/dinner on Sunday.

■ As other courts have recently expressed and we agree,

> an isolated instance of moderate or reasonable physical force ... *that results in nothing more than transient pain or temporary marks or bruises is protected under the parental discipline privilege.*
>
> *This protection for parents should exist even if the parent acts out of frustration or short temper. Parents do not always act with calmness of mind or considered judgment when upset with, or concerned about, their children's behavior. Nor do parents*

*always act pursuant to a clearly defined circumstance of discipline or control. A reaction often occurs from behavior a parent deems inappropriate that irritates or angers the parent, causing a reactive, demonstrative act. Heat of the moment must not result in immoderate physical force and must be managed; however, an angry moment driving moderate or reasonable discipline is often part and parcel of the real world of parenting with which prosecutors and courts should not interfere.* What parent among us can say he or she has not been angered to some degree from a child's defiant, impudent, or insolent conduct, sufficient to call for spontaneous, stern, and meaningful discipline?

*State v. Lefevre*, 138 N.M. 174, 117 P.3d 980, 984–85 (App.2005) (emphases added) (holding that the father's "demonstrative act, even if an angry touching, result[ing] in only a temporary, dime-sized bruise on [the d]aughter's hand and transient pain" fell within the parental privilege). Courts have also recognized that, although corporal discipline may be considered excessive when it results in significant bruises or welts, "bruises are not necessarily indicative of excessive corporal discipline." *T.G. v. Dep't of Children & Families*, 927 So.2d 104, 106 (Fla.Dist.Ct. App.2006) (holding that a bruise, without any evidence that such bruise required medical attention, was not sufficient to constitute abuse); *see also S.L. v. Dep't of Children & Families*, 787 So.2d 973, 974 (Fla.Dist.Ct. App.2001) ("Most corporal punishment, even that which is not excessive, produces temporary marks of some kind."). Moreover, as observed by another court,

> [if] the mere application of a parent's hand to a child's backside that results in even minimal bruising would, as a matter of law, require a finding of physical abuse[, it] would preclude an explanation or consideration of the reasonableness of the act that caused the injury. Even more alarming is that this interpretation requires a finding of physical abuse when a parent attempts to save a child from harm but, in doing so, bruises or injures the child.

*Lovan C. v. Dep't of Children & Families*, 86 Conn.App. 290, 860 A.2d 1283, 1289 (2004)

(emphasis added).[13] Indeed, this court and the ICA have reversed convictions in cases where the parental force employed was more severe than in this case, holding that the discipline used was within the protection afforded by HRS § 703–309(1). *See Deleon*, 72 Haw. at 242–44, 813 P.2d at 1383–84 (involving fourteen-year-old complainant who was hit with a folded belt six to ten times); *Kaimimoku*, 9 Haw.App. at 353, 841 P.2d at 1080 (involving seventeen-year-old complainant who was slapped in the face and punched in the shoulder).

Nevertheless, the dissent takes issue with our holding, contending that "the record, viewed in the light most favorable to the prosecution, contains substantial evidence to support the jury verdict." Dissenting Op. at 172, 166 P.3d at 345. In advancing its position, the dissent explains that:

> Throughout the conversation Mother grew increasing incensed over Daughter's poor performance and deception, and (1) struck Daughter with a plastic backpack approximately sixteen inches by twelve inches in size, (2) struck Daughter approximately five times on her left forearm with a plastic hanger, (3) struck Daughter on the top of her left hand with the hard, flat side of a[car] brush, and (4) struck Daughter on the knuckles with the plastic handle of a rusted, metal tool. Daughter testified that Mother was taller, heavier, and stronger. *Mother admitted* that she lost control, and *that she was forcefully swinging the various implements.*
>
> Viewed in the light most favorable to the prosecution, the record establishes that Mother, a parent of superior size and strength, lost control and *forcefully struck Daughter*, among other things, with the blunt handle of a rusted metal tool. Such a blow carried with it an attendant risk of causing "substantial bodily injury[.]"

(Citation and footnote omitted.) (Emphases added.) Dissenting Op. at 178, 166 P.3d at 351 (citations to the record omitted).

The dissent fails to account for the circumstances that gave rise to the disciplining and the resulting bruises on Daughter's left forearm. The dissent attempts to portray Mother as an out-of-control parent who repeatedly used various implements to discipline Daughter for her poor performance in school. *See* Dissenting Op. at 178, 166 P.3d at 351. However, as discussed above, the evidence reveals that Mother disciplined Daughter for her continuously defiant behavior in refusing to answer Mother's questions and in lying to her. Specifically, Mother hit Daughter with a plastic backpack because Daughter refused to respond to Mother's questions regarding Daughter's report card. Mother hit Daughter with a plastic hanger because Daughter again refused to answer Mother questions—this time—regarding her whereabouts during the time she was supposed to be attending her tutoring classes. And, only upon learning of Daughter's activities, *i.e.*, skipping tutoring classes and hanging out with her friends at the mall, did Mother hit Daughter once with the flat side of a small car brush and once with a plastic handle of a tool, both of which Daughter testified did not hurt.

Although we recognize Mother's admission that she lost "a little control" is a factor to be considered, such admission alone is not indicative of child abuse. As discussed above, the parental justification defense statute requires this court to take into consideration numerous factors in determining whether abuse has occurred. Of great significance is the degree of force employed, which the dissent appears to disregard. Rather, the dissent places strong emphasis upon the fact that this case involved the use of multiple implements. For instance, the dissent admits that, although the "the case at bar bears some factual resemblance to *Deleon* to the extent that the minors in both cases suffered

---

13. In Connecticut, section 53a–18 of the General Statutes provides that

the use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances: (1) A parent, guardian or other person entrusted with the care and supervision of a minor ... *may use reasonable physical force upon such minor ... when and to the extent that he reasonably believed such to be necessary to maintain discipline or to promote the welfare of such minor* [.]

*Id.* at 1288 (emphasis added) (original brackets omitted) (ellipses in original).

bruises lasting approximately one week[,]" but states that "[t]he distinction, however, lies in the *modus operandi.*" Dissenting Op. at 177, 166 P.3d at 350. According to the dissent, there is a "considerable difference between striking a child with a belt[, as in *Deleon,*] and striking a child with *various hard, blunt implements* [inasmuch as] the latter method presents a greater potential for substantial bodily injury—*i.e.*, major avulsions, lacerations, penetrations of the skin, and bone fractures." *Id.* at 177, 166 P.3d at 350 (emphases added). We, however, perceive some major flaws in the dissent's interpretation. First, the dissent predicates the offense of child abuse exclusively upon the use of *multiple* implements (as opposed to a *single* implement, *e.g.*, a belt). Second, the dissent effectively alters the standard set by the legislature and contravenes the purpose of the statute in recognizing a parent's right "to use *force* to discipline their children ..., subject to clear requirements not to cause permanent injury." HRS § 703–309(1) cmt. (emphasis added). We can see no support from the letter and spirit of the subject statute to render a parent's use of multiple implements upon a minor as child abuse *per se.* As one court stated,

> the use of an object ... should not blind a court to the many other factors which should and must be considered when weighing the evidence to determine the "reasonableness" of the discipline. We must take care not to create a legal standard from our personal notions of how best to discipline a child.

*In re J.P.*, 294 Ill.App.3d 991, 229 Ill.Dec. 565, 692 N.E.2d 338, 346 (1998).

█ The basic conception of the parental justification defense is to allow a person responsible for a child's welfare to use *reasonable force* to discipline that child. To determine whether the force falls within the

limitation of parental discipline, the factors set forth in HRS § 703–309(1) must be considered. Thus, the implements, if and when used in disciplining a child, do not automatically render the parental justification defense inapplicable; rather, the applicability of the defense essentially depends upon the manner in which the implements were used, *i.e.*, the degree of force exerted. The use of physical force exceeds acceptable norms when such force has the potential "to cause or known to create risk of causing substantial bodily injury ... [, or] extreme pain[.]" HRS § 703–309(1)(b). Contrary to the dissent's contention, we cannot perceive how the force employed by Mother, which, according to Daughter, was not hard and only caused her temporary pain, could somehow have the potential of creating "substantial bodily injury," such as, "major avulsions, lacerations, penetrations of the skin," "bone fracture," and "serious concussion." HRS § 707–700. Were that the case, even the use of mild force, which this court held as permissible under HRS § 703–309(1), *see Stocker,* 90 Hawai'i at 96, 976 P.2d at 410, would now be considered as capable of causing substantial bodily injury and necessarily constitute child abuse.

█ Based on the foregoing, we hold that Mother's conduct fell within the parameters of the justified parental discipline statute and that, as a matter of law, the evidence in this case was insufficient to support a determination of guilt on the charge of abuse of a family or household member beyond a reasonable doubt.[14] However, this court has previously stated—and we believe it is worthy of reiteration at this point—that

> our opinion today should not in any way be construed as an expression of approval of the parental conduct that precipitated the prosecution of the matter before us. Nei-

14. We do not see how our holding today "narrow[s] the gap and thereby restrict[s] the realm reserved for the trier of fact" as the dissent contends. Dissenting Op. at 178, 166 P.3d at 351. As stated earlier, although we do not lightly set aside a jury's verdict, we will not hesitate to do so when such verdict, as here, is not supported by the evidence. Nor do we believe that the result of this case sends a message that "henceforth, where a parent losses [sic] control over a child's repeated and prolonged deception about failing to attend tutoring sessions which contributed to poor performance in school, that parent is permitted, *as a matter of law,* to respond in the fashion Mother did here." *Id.* at 178, 166 P.3d at 351 (emphasis in original). Again, we review child abuse cases on a case-by-case basis, and, based upon all of the evidence in this case, we believe Mother's use of force falls within the bounds of parental discipline.

ther should our opinion be viewed as an endorsement, of any kind, of the use by parents of corporal punishment of their children. It is common knowledge that the utility—not to mention the simple humanity—of corporal punishment as a parental tool is the subject of considerable controversy within American society. Nevertheless, it is equally obvious that the permissibility of corporal punishment reflects a societal judgment that falls well within the parameters of legitimate and constitutional legislative policy-making. In this regard, the legislature has expressed its judgment, for better or worse, through the parental discipline defense, as enacted in HRS § 703–309(1). What, in its wisdom, the legislature has codified, it is free to amend or repeal. But as long as HRS § 703–309(1) remains the law of this state, we are bound to construe and enforce it.

*Stocker,* 90 Hawai'i at 96, 976 P.2d at 410. We, therefore, hold that the ICA gravely erred in affirming Mother's conviction and sentence.

### B. *The Allen–Like Instruction*

█ Mother finally contends that the trial court, in responding to the jury's communication, improperly issued what amounted to an *Allen* instruction, which led the jurors to believe that their "deadlocked" position was unacceptable. However, our holding today renders Mother's last contention moot.[15]

### IV. *CONCLUSION*

Based on the foregoing, we vacate the ICA's August 29, 2006 judgment and reverse

15. Having concluded that there was sufficient evidence to support Mother's conviction, the dissent was required to address Mother's next contention that the trial court erred in its response to the jury's communication that it was deadlocked, which response, according to Mother, amounted to an improper *Allen* instruction. However, as discussed above, we need not entertain the issue in light of our holding. Doing so would violate "one of the prudential rules of judicial self-governance" that "courts are to avoid advisory opinions on abstract propositions of law." *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 87, 734 P.2d 161, 165 (1987) (internal quotation marks, citation, and original brackets omitted). As this court has stated:

the trial court's August 5, 2005 judgment of conviction and sentence.

### Concurring Opinion by ACOBA, J.

As to the two issues that were presented on appeal, first, I concur in the result because I believe that the evidence was insufficient to rebut the parental justification defense under Hawai'i Revised Statutes (HRS) § 703–309(1) (1993) of Petitioner/Defendant-Appellant/Cross-Appellee Ijeva Matavale (Mother) beyond a reasonable doubt. Second, I believe the instruction given by the family court of the first circuit (the court) to the "deadlocked" jury was incorrect and, also, that that instruction must be addressed in light of our supervisory jurisdiction under HRS § 602–4 (1993) and in light of the dissent's view of that instruction.

### I.

With respect to Mother's parental justification defense, the decisions of this court cannot be read to prohibit the use of physical force in disciplining children altogether. The use of parental force is permissible under the penal law, for under appropriate circumstances, "a parent might justifiably believe that the use of physical force was the only proper alternative left to the parent to fulfill his or her obligation under HRS § 577–7 (1993) to control his or her child's conduct." *State v. Tanielu,* 82 Hawai'i 373, 381, 922 P.2d 986, 994 (1996) (footnote omitted). HRS § 577–7(a) provides in relevant part that "[p]arents shall have control over the

> The duty of this court, as of every other judicial tribunal, *is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions* or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.
> Courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so.
> *Wong v. Bd. of Regents, Univ. of Hawaii,* 62 Haw. 391, 394–95, 616 P.2d 201, 204 (1980) (citations omitted) (emphases added). Moreover, we note that the *Allen* instruction issue is clearly not one which falls within the exception to the mootness doctrine, *i.e.,* that the issue is "capable of repetition, yet evading review." *Id.* at 396, 616 P.2d at 204 (citation omitted).

conduct and education of their minor children. . . . All parents . . . shall provide, to the best of their abilities, for the discipline, support, and education of their children." It appears the legislature has indicated that "[p]revention and punishment of a child's misconduct are both included in HRS § 703–309 as examples of when a parent's use of force may be 'reasonably related to the purpose of safeguarding or promoting the welfare of the minor.'" *Tanielu*, 82 Hawai'i at 381, 922 P.2d at 994.

Thus, "[a]lthough the use of physical force as a child-rearing method may engender debate, it is an option parents are free to employ within the bounds of the statute." *Id.* Consequently, "HRS § 703–309 permits the use of physical force to punish a minor child for his or her misconduct and to deter that minor from future misconduct." *Id.* Under the facts adduced here, and consonant with precedent in this jurisdiction, Mother's "use of physical force to punish or deter . . . is not subject to criminal liability [because] it [was] reasonably related to the welfare of the minor and within the scope of allowable physical force under the statute." *Id.*

## II.

### A.

Preliminarily, as to the "deadlock" instruction issue, the circumstances call for exercise of our supervisory jurisdiction as to which the mootness doctrine would not apply.[1] In this case we filed an "Order Accepting Application for Writ of Certiorari" expressly in-

forming the parties that the sole issue on oral argument was the matter of the deadlock instruction.

Mother's application for a writ of certiorari . . . is . . . accepted and will be scheduled for oral argument on the following *sole issue:* "whether the Family Court committed reversible error when it instructed the jury to continue deliberations and directed the jury to a previously-promulgated instruction after the jury had indicated that it was deadlocked."

(Emphasis in original.) That order further stated that "the parties may, within 30 days from the date of this order, file a supplemental brief addressing the *sole issue to be discussed in oral argument.*" (Emphasis added.) Mother did file a supplemental brief. Oral argument, accordingly, was overwhelmingly devoted to the appropriateness of the foregoing instruction. Hence, the point raised as to the deadlocked instruction was of primary importance to this court and was extensively briefed and argued.

Despite the precedent established in *State v. Fajardo*, 67 Haw. 593, 699 P.2d 20 (1985), and *State v. Villeza*, 72 Haw. 327, 817 P.2d 1054 (1991), the question of an appropriate instruction to a deadlocked jury has again arisen in this case. Under HRS § 602–4, this court is granted "general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law." *See State v. Kealaiki*, 95 Hawai'i 309, 317, 22 P.3d 588, 596 (2001) (recognizing that "[w]e could assert supervi-

---

1. Inasmuch as we may exercise supervisory jurisdiction as to the "deadlock" instruction, and the viability of the court's instruction is argued by the dissent, that issue is not moot as the plurality contends. Additionally, the following may be noted. In *Wong v. Bd. of Regents, Univ. of Hawaii*, 62 Haw. 391, 616 P.2d 201 (1980), the appellant was seeking injunctive and declaratory relief to enjoin the University of Hawai'i from imposing disciplinary action against the appellant. *Id.* at 392, 616 P.2d at 202. After the appeal was filed, however, "appellant and the University entered into another stipulation [and the] University agreed to terminate its disciplinary proceedings against appellant and to keep his school record free from any mention of the proceedings or charges. By then appellant had graduated from the University and had never

sought admission for graduate work there." *Id.* at 394, 616 P.2d at 203. This court held that the doctrine of mootness was applicable to the case on appeal because the controversy on appeal no longer affected the legal relations of the parties. *Id.* at 396, 616 P.2d at 205. By contrast, in the instant case, the legal controversy between the parties remained intact on appeal, leaving it to this court to decide the issues.

Additionally, while *Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw. 81, 734 P.2d 161 (1987), stated the proposition cited by the plurality, in that case this court declined to apply the very proposition cited, recognizing that in certain exceptional situations such as when the question on appeal affects the public interest, mootness is not an obstacle to the consideration of the appeal. *Id.* at 87–88, 734 P.2d at 165–66.

sory jurisdiction under HRS § 602–4 over the trial courts 'to prevent and correct errors and abuses therein where no other remedy is expressly provided for by law' ") (quoting *State v. Ui*, 66 Haw. 366, 367, 663 P.2d 630, 631 (1983)); *State v. Moniz*, 69 Haw. 370, 742 P.2d 373 (1987); *In re Carvelo*, 44 Haw. 31, 352 P.2d 616 (1959). In my view this case necessitates the employment of supervisory jurisdiction.

### B.

In connection with the deadlock instruction, the jury had informed the court, "We are in a deadlocked decision. What next?" Apparently without showing the court's written instruction to counsel,[2] in answer to the question, "What next?" the court replied, "Continue with your deliberations. See p. 16 of the instructions."[3] By informing the jury to continue and in referring to the deliberation instruction, the court directed the jury to resume deliberating despite the jury's statement that it was deadlocked.

Because this was in response to their query, "What next?" the jurors would have been reasonably led to believe that they "could be deliberating indefinitely unless [they] unanimously reached a verdict[.]" *Villeza*, 72 Haw. at 336, 817 P.2d at 1059. The instruction thus "pressur[ed] ... the jury to reach a verdict based on compromise and expediency." *Id.* at 334, 817 P.2d at 1058. Such an instruction was seemingly aimed at avoiding a hung jury. However, a hung jury is a safeguard of our judicial system.

*A mistrial from a hung jury is a safeguard built into the American system of*

2. It appears the court did not follow the procedure regarding communications from the jury set forth in Hawai'i Rules of Penal Procedure (HRPP) Rule 30. HRPP Rule 30(e) states in pertinent part, as follows:

If, during deliberation on its verdict, the jury shall request further instructions, the court may further instruct the jury in accordance with instructions prepared by the court *and reduced to writing, first submitting the same to counsel.*
(Emphasis added.)

3. The reference to "p. 16" was a command to re-read the instruction on jury deliberation. The instruction states:

*jurisprudence.* "In our system this is a desirable result. Despite the fact that each trial which ends in a hung jury may appear to be an exercise in futility and may create understandable judicial frustration, it should be remembered that a hung jury is only undesirable where the hanging jurors simply refuse to join in conscientious collective deliberation in an honest effort to reach a verdict. There simply is no evidence that any significant number of American jurors approach their task in such a manner. What evidence there is all points the other way."

*Fajardo*, 67 Haw. at 600, 699 P.2d at 24 (quoting Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge*, 53 Va. L.Rev. 123, 146 (1967) (emphasis added) (footnote omitted)). The instruction accordingly was prejudicial.

### C.

Rather than the court's chosen response, Respondent/Plaintiff–Appellee/Cross–Appellant State of Hawai'i (Respondent) properly suggested that the jury be asked, "Would more time assist you in reaching a unanimous verdict?" At the August 4, 2005 hearing, Respondent argued that the court's instruction was legally incorrect:

[RESPONDENT]: The State's position is the more proper response in your response to a juror communication indicating that they are in a deadlock is "Would more time assist you in, uh, reaching a unanimous verdict?" State cites, uh, the case of *State v. Fajardo* which was—which—

THE COURT: Why don't you give us a cite on that as well?

A verdict must represent considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous.

Each of you must decide the case for yourself, but it is your duty to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violating your individual judgment. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest belief as to weight or effect of evidence for mere purpose of returning a verdict.

[RESPONDENT]: Citation for that case is 67 Haw. 593 [699 P.2d 20]. This case basically said that the Allen Instruction would no longer be allowed and this is the Allen Instruction, the so-called "dynamite instruction" said to blast a verdict out of a jury. State, uh, submits that *the, um "Continue with your deliberations" after a communication of "We are at a deadlock," it comes very close to, if not as exactly, what the court in, uh, Fajardo was saying he's no longer—uh, will no longer—will no longer be tolerated. State submits that the more proper response to that-to that communication is what the State suggested.*

(Emphases added.) Respondent was correct and rightly objected to the charge.

I note, however, that on appeal, Respondent appears to argue a position opposite from that maintained at the trial below. Relying on *Fajardo*, Respondent contends on appeal that the reference to "p. 16" of the instructions cured any error in this case.

[T]he trial court's response to jury communication number one simply directed the jury to the trial court's general instruction—on "page 16 of the instructions"—given earlier on how to go about its deliberations. When read and considered as a whole, it is clear that the jury was properly instructed as to their duty to deliberate—that it *should only reach agreement if it can do so without violating individual judgment, that it should not surrender an honest belief as to the weight or effect of evidence for the mere purpose of returning a verdict, and that therefore it may not be able to reach agreement.* Consequently no prejudicial effect had befallen defendant.

(Emphasis added.) But that argument has been made before and rejected. This court has said that the same instruction as found on page 16 of the instant case does not remedy an instruction of the sort given by the court.

The State highlights the phrase in the first paragraph of instruction no. 14, which states "if you can do so without violence to individual judgment," as a caveat in following the court's response to jury communication no. 4. *However, "an erroneous instruction, clearly prejudicial cannot be cured by another instruction which correctly states the law, but does not call the attention of the jury to the erroneous instruction."* State v. Napeahi, 57 Haw. 365, 377, 556 P.2d 569, 577 (1976) (citation omitted). The phrase, "if you can do so without violence to individual judgment" related to "returning a verdict" and has nothing to do with the issue of being deadlocked. Instruction no. 14 simply defined how the jury should reach a verdict.

*Villeza*, 72 Haw. at 337, 817 P.2d at 1059 (emphasis added) (brackets omitted). In this case the erroneous response given by the court to continue deliberations cannot save the response because the instruction on page 16 "does not call the attention of the jury to the erroneous instruction." *Id.* In sum, under *Villeza* and *Fajardo*, the court reversibly erred in instructing the jury to continue to deliberate in the face of the jury's advisement to the court that it was deadlocked, rather than in instructing the jury as Respondent had requested.

Dissenting Opinion by NAKAYAMA, J., with whom, DUFFY, J., Joins.

I respectfully dissent. In my view, the plurality uses the appellate record to retry the facts of the case and has thereby commandeered the fact-finding function traditionally reserved for the jury, replacing the jury's verdict with a verdict of its own. To wit, the plurality holds, as a matter of law, that evidence of the corporal punishment delivered by Mother upon Daughter was insufficient to sustain the jury's verdict convicting Mother of the offense of Abuse of Family or Household Members. Inasmuch as (1) I do not believe the cases cited by the plurality are controlling, (2) the record, viewed in the light most favorable to the prosecution, contains substantial evidence to support the jury verdict, and (3) the trial court's response to the jury communication was not improper, I would hold that the Intermediate Court of Appeals ("ICA") did not gravely err by affirming Mother's conviction.

## I. DISCUSSION

### A. This Jurisdiction's Child Abuse Jurisprudence Does Not Require a Finding of Insufficient Evidence as a Matter of Law.

The plurality relies heavily on six cases drawn from this jurisdiction's child abuse

jurisprudence: (1) *State v. Deleon,* 72 Haw. 241, 813 P.2d 1382 (1991); (2) *State v. Crouser,* 81 Hawai'i 5, 911 P.2d 725 (1996); (3) *State v. Stocker,* 90 Hawai'i 85, 976 P.2d 399 (1999); (4) *State v. Kaimimoku,* 9 Haw.App. 345, 841 P.2d 1076 (1992); (5) *State v. Tanielu,* 82 Hawai'i 373, 922 P.2d 986 (App.1996); and (6) *State v. Miller,* 105 Hawai'i 394, 98 P.3d 265 (App.2004). For the following reasons, I believe that these cases do not mandate the conclusion that Mother's conduct in the present case did not, as a matter of law, constitute the offense of Abuse of Family or Household Members.

I first address *Crouser, Miller,* and *Tanielu,* to the extent that they share the same defect in application to the present case.

In *Crouser,* the female victim ("Minor") was fourteen years of age. 81 Hawai'i at 8, 911 P.2d at 728. Minor was required by her mother ("Mother") and Mother's boyfriend, Delbert L. Crouser ("Crouser"), to bring home a daily progress report from school. *Id.* On May 19, 1993, Minor forgot to pick up the report from her counselor and, consequently, filled out the report herself, changing several grades and her attendance record. *Id.* Crouser discovered Minor's attempt at deception and unleashed a fury of punishment that lasted for approximately a half-hour. *Id.* Specifically, Crouser struck Minor across both sides of her face, knocking her to the ground. *Id.* As Minor tried to stand, Crouser threw her onto the bed, yanked her pants and underwear down around her knees, and proceeded to "whack[ ]" her bottom. *Id.* Crouser thereafter left the room to retrieve a plastic baseball bat. *Id.* When he returned, he repeatedly struck Minor "on the buttocks, arm, thighs, and torso until the bat broke." *Id.* For approximately one hour following the beating, Minor experienced dizziness and had difficulty sitting. *Id.* On the day following the incident, Minor could not sit in the hard student chairs, and was permitted to either sit in the padded teacher's chair or stand. *Id.* Minor experienced lingering pain in her buttocks for another two weeks. *Id.*

Because Minor reported difficulty sitting, Minor was sent to the school health aide, Shirley Yamaguchi ("Yamaguchi"). *Id.* Yamaguchi observed that Minor "waddled stiffly[,]" was "very emotional" and "unable to sit at the desk, where she customarily talked with students." *Id.* Yamaguchi called the school counselor, and they both observed that Minor's buttocks were "bruised and colored a deep reddish-purple." *Id.* at 9, 911 P.2d at 729 (emphasis removed). They also observed "bruising to Minor's arm, thigh, and torso[.]" *Id.* Yamaguchi testified that Minor's injuries were the worst she had ever seen in a discipline case. *Id.*

Following a bench trial, Crouser was convicted of committing the offense of Abuse of Family and Household Members. *Id.* at 7, 911 P.2d at 727. On appeal, Crouser argued that the trial court clearly erred by rejecting the parental discipline defense. *Id.* at 10, 911 P.2d at 730. We noted that the trial court determined, *inter alia,* that "the force used was not reasonably related to the purpose of safeguarding the welfare of the minor *and* it was designed to cause or known to create a risk of causing substantial bodily injury or mental distress." *Id.* (emphasis in original). We thereafter affirmed the trial court, holding that neither conclusion was clearly erroneous. *Id.* at 15, 911 P.2d at 735.

In *Miller,* Michael Damien Miller ("Miller") was convicted of Abuse of Family or Household Members for physically abusing his eleven-year-old nephew ("CW"). 105 Hawai'i at 395–96, 98 P.3d at 266–67. On October 16, 2001, Miller picked CW up from school. *Id.* at 396, 98 P.3d at 267. Miller tickled CW as they drove home and did not comply with CW's requests for him to stop. *Id.* When CW grabbed Miller's arm to make him stop, Miller hit him. *Id.* Additionally, when CW asked Miller to turn down the radio because of a headache, Miller responded by turning the volume up. *Id.* Miller's conduct angered CW, and when they stopped at a gas station CW exited the vehicle and walked away. *Id.* When CW turned around to look back, Miller and the car were gone. *Id.* However, Miller returned shortly thereafter, pushed CW to the ground, and yelled at him to get back in the car. *Id.* CW sat on the ground, cross-legged, and refused to move. *Id.* Miller made several attempts to pick CW up by the ear and by the hair, but

each time CW fell back to the ground. *Id.* Miller proceeded to kick CW and delivered several blows with a closed fist to CW's head, back, and ribs. *Id.* The punishment finally ceased when a witness intervened and ultimately got into a fist-fight with Miller. *Id.* CW sustained several injuries as a result of the beating, including (1) a bump on the head, (2) scratches on his face and ears, and (3) lingering pain in his back and ribs. *Id.*

The family court concluded that the parental discipline defense did not apply "where the defendant's own conduct provoked or caused the misconduct on the part of the victim which gave rise to the use of force." *Id.* at 398, 98 P.3d at 269. The family court reasoned further that, even if the parental discipline defense was available, the prosecution disproved it beyond a reasonable doubt insofar as (1) "the use of force employed by defendant was not reasonably related to the purpose of safeguarding or promoting the welfare of the minor[,]" *id.*, and (2) "[n]or was the force used not designed to cause or create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress or *neurological damage* [,]" *id.* (emphasis in original). The ICA affirmed the family court's judgment on the grounds that the record contained sufficient evidence to negate Miller's defense and the family court's decision in that regard was not clearly erroneous. *Id.* at 402, 98 P.3d at 273.

In *Tanielu,* Iese Tanielu ("Tanielu") was convicted of Abuse of Family or Household Members for physically disciplining his fourteen-year-old daughter ("Daughter") for her continued relationship with her eighteen-year-old boyfriend ("Boyfriend"). Tanielu and his wife ("Wife") disapproved of Boyfriend, whom Wife described as "verbally and physically 'very abusive[.]'" 82 Hawai'i at 376, 922 P.2d at 989 (brackets in original). Daughter eventually agreed to postpone her relationship with Boyfriend until after she completed highschool. *Id.* However, unbeknownst to her parents, she continued the relationship in secret. *Id.* Wife later uncovered the truth and Daughter admitted that she had been skipping classes to see Boy-

friend and spent time with Boyfriend in his bedroom. *Id.* Wife scheduled a pelvic examination to determine whether Daughter was pregnant, but on the scheduled day of the examination Daughter ran away from home to live with Boyfriend. *Id.* Wife and her brother thereafter retrieved Daughter from Boyfriend's home. *Id.* Tanielu and Wife then confronted Daughter about her relationship with Boyfriend. *Id.* at 377, 922 P.2d at 990. Daughter was unresponsive, and Tanielu and Wife proceeded to deliver an onslaught of blows, including slapping and punching Daughter in the face, kicking Daughter in the shin and face, stomping on Daughter's face, and pulling Daughter's ears. *Id.* Daughter sustained multiple contusions and lacerations on her face and neck, and several bruises on her legs, as a result of the beating. *Id.*

At trial, the family court rejected Tanielu's parental discipline defense, concluding, *inter alia,* that (1) the prosecution adduced evidence that Tanielu actually caused substantial bodily injury (*i.e.,* lacerations and penetrations of the skin), *id.* at 378, 922 P.2d at 991, and (2) the "viciousness" of the attack was not reasonably related to promoting Daughter's welfare, *id.* at 380, 922 P.2d at 993. On appeal, the ICA first concluded that the family court erred by not finding that the lacerations that Daughter suffered or could have suffered were "major." [1] *Id.* Thus, the family court failed to apply the correct legal requirement. *Id.* Nevertheless, the ICA agreed with the family court that "the 'viciousness of the attack' [Tanielu] was involved in severed any relationship between the use of force and the welfare of Daughter which might be considered 'reasonable.'" *Id.* at 381, 922 P.2d at 994. Accordingly, the ICA affirmed the family court's judgment of conviction. *Id.*

*Crouser, Miller,* and *Tanielu* provide examples of conduct that fall within, but do not exhaustively define, the upper echelon of the spectrum of corporal punishment that a trier of fact may properly find constitutes abuse (*i.e.,* corporal punishment that exceeds the scope of the parental discipline defense). To

---

**1.** It should be noted that the ICA did not offer its own opinion as to whether the injuries sustained by Daughter coincided with the legal definition of "substantial bodily injury."

the extent that these cases do not establish the minimum degree of punishment that will constitute abuse, they provide little assistance in determining whether the corporal punishment delivered by Mother is insufficient to constitute abuse as a matter of law.

The plurality also may not rely on *Deleon* or *Kaimimoku* for support inasmuch as those cases were decided under a substantially different statutory version of the parental discipline defense.

In *Deleon*, Artemio A. Deleon ("Deleon") was convicted of the offense of Abuse of Family or Household Members. 72 Haw. at 241, 813 P.2d at 1382. On May 24, 1990, the day of the incident in question, Deleon arrived home and heard his fourteen-year-old daughter ("Daughter") and her friends in the house. *Id.* at 242, 813 P.2d at 1383. Deleon had repeatedly informed his Daughter that he did not want her friends at the house because he believed that they were a bad influence on her. *Id.* Deleon warned Daughter that he would spank her with a belt if she violated the rule. *Id.* Entering the house, Deleon heard one of Daughter's friends crying. *Id.* He asked Daughter what happened but got no satisfactory answer. *Id.* He then told Daughter's friends to go home, but they refused. *Id.* At that point, Deleon struck Daughter directly above the knees between six and ten times with a 36-inch long belt. *Id.* Daughter testified that she felt a little pain and that the pain lasted for one and a half hours. *Id.* She had bruises for approximately one week. *Id.* Deleon also cut Daughter's waist-long hair so that it was level with her neck. *Id.*

At trial, Deleon relied upon the parental discipline defense. *Id.* at 243, 813 P.2d at 1383. The parental discipline defense in effect at that time read as follows:

The use of force upon or toward the person of another is justifiable under the following circumstances:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of such parent, guardian, or other responsible person, and:

(a) The force is used for the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of his misconduct; and

(b) The force used is not designed to cause or known to create a substantial risk of causing *death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation.*

*Id.* (citing HRS § 703–309 (1985)) (emphasis added). The trial judge found that the parental justification defense was unavailable because Deleon caused "extreme pain." *Id.* at 244, 813 P.2d at 1383. This court disagreed and reversed Deleon's conviction. Applying the maxim *noscitur a sociis,* a canon of statutory interpretation, we concluded that

the pain inflicted upon [Daughter] by her father in the course of the incident in question, does not come, in degree, anywhere near *death, serious bodily injury, disfigurement, extreme mental distress or gross degradation.* It therefore was *not,* as a matter of law, serious pain. [Deleon's] conduct in the incident in question therefore was justified under HRS § 703–309(1)(a) and (b), and consequently was not a violation of HRS § 709–906.

*Id.* at 244, 813 P.2d at 1384 (some emphasis added and some in original).

In *Kaimimoku,* Henry A.K. Kaimimoku ("Kaimimoku") was convicted of Abuse of Family or Household Members for striking his seventeen-year-old daughter ("Daughter"). 9 Haw.App. at 346, 841 P.2d at 1077. On February 13, 1991, Kaimimoku was at home with his grandson ("Grandson"). *Id.* When Kaimimoku's wife ("Wife") returned home with Daughter, Kaimimoku began yelling at Wife because she was gone for a long period of time and he had difficulty caring for Grandson. *Id.* Daughter intervened, and, standing face-to-face with Kaimimoku, used profanity and yelled at him to leave Wife alone. *Id.* This triggered an expletive-laden "communicat[ion]" between Kaimimoku and Daughter. *Id.* Wife tried to separate Kaimimoku and Daughter, and Daughter subsequently ran outside. *Id.* at 347, 841 P.2d at 1077. Kaimimoku followed Daughter and

commenced with the corporal punishment that engendered his criminal prosecution. *Id.* Specifically, Kaimimoku slapped and "whacked" Daughter in the face and punched her in the shoulders multiple times with a closed fist. *Id.* As they were walking back to the house, Daughter again used profanity towards Kaimimoku and he again slapped and "whacked" Daughter. *Id.* As a result, Daughter experienced pain to the back and chest areas and sustained bruises and a scratch on her shoulder. *Id.* at 347–48, 841 P.2d at 1078.

At trial, the family court rejected Kaimimoku's parental discipline defense. *Id.* at 348, 841 P.2d at 1078. The family court found that (1) Kaimimoku's conduct was not disciplinary in nature, (2) even if disciplinary, Kaimimoku did not use reasonable force, and (3) the force used was not designed to promote the welfare of Daughter or to prevent or punish misconduct. *Id.* The ICA reversed the family court's judgment of conviction. *Id.* at 352, 841 P.2d at 1080. The ICA perceived substantial evidence in the record that the force used by Kaimimoku was for the purpose of punishing Daughter for yelling profanities, disobedience, and disrespect. *Id.* The ICA stated that "[t]here [was] no evidence on the record that [Kaimimoku] struck Daughter for any purpose other than for punishment." *Id.* The ICA next considered whether the record contained substantial evidence that the force used by Kaimimoku was "not designed to cause or known to create a substantial risk of causing *death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation.*" *Id.* (citing HRS § 703–309(1)(b) (1985)) (emphasis added). The ICA reasoned that the punishment delivered by Kaimimoku in the present case was no worse than the belt-lashing in *Deleon* and that the evidence was therefore insufficient to establish that the force used exceeded the limits imposed by HRS § 703–309(1)(b). *Id.* Accordingly, the ICA concluded that the prosecution failed to disprove Kaimimoku's parental discipline defense beyond a reasonable doubt. *Id.*

In *Deleon* and *Kaimimoku*, the punishment was deemed insufficient as a matter of law to rise to the level of creating a risk of "death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation." HRS § 703–309(1)(b) (1985). However, that standard is no longer applicable. In 1992, the legislature substantially amended HRS § 703–309(1). *See generally* 1992 Haw. Sess. Laws Act 210, § 1 at 554–56. The statutory section now reads as follows:

§ 703–309 **Use of force by persons with special responsibility for care, discipline, or safety of others.** The use of force upon or toward the person of another is justifiable under the following circumstances:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:

(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

HRS § 703–309(1) (1993). Legislative committee reports indicate that the legislature intentionally imposed greater limits on the degree of punitive actions that may be taken against a child. *See* Conf. Comm. Rep. No. 103, in 1992 House Journal, at 843 ("The purpose of this bill is to reduce the permitted level of force that a person responsible for the care of a minor, or an incompetent person, may use."); Stand. Comm. Rep. No. 828–92, in 1992 House Journal, at 1206 ("The purpose of this bill ... is to ... prohibit persons with special responsibility for care, discipline, or safety of others to use force in excess of what is reasonable and moderate under the circumstances."). Thus, while the corporal punishments in *Deleon* and *Kaimimoku* were obviously not designed to cause or create a known risk of causing "death, serious bodily injury, disfigurement, extreme

pain or mental distress, or gross degradation," HRS § 703–309(1)(b) (1985), neither this court in *Deleon*, nor the ICA in *Kaimimoku*, commented as to whether such punishments complied with the greater limitations imposed on parental discipline by HRS § 703–309(1)(b) (1993).

I recognize, however, that the legislature has indicated that the amendments were not intended to alter the result in *Deleon*. Specifically, the legislature stated that "the changes are not intended to create a standard under which the results in *Deleon* would have been different. The force used by the father in *Deleon*, as described in the decision, did not exceed the permissible force under the new language." Stand. Comm. Rep. No. 2493, in 1992 Senate Journal, at 1121. Admittedly, the case at bar bears some factual resemblance to *Deleon* to the extent that the minors in both cases suffered bruises lasting approximately one week. The distinction, however, lies in the *modus operandi*. I perceive a considerable difference between striking a child with a belt and striking a child with various hard, blunt implements. In my view, the latter method presents a greater potential for substantial bodily injury—*i.e.*, major avulsions, lacerations, penetrations of the skin, and bone fractures. *See* discussion *infra*. This fact, coupled with Mother's superior size and strength and her admitted loss of control sufficiently distinguishes the present case from *Deleon*.

Finally, I turn to the plurality's reliance on *Stocker*. In *Stocker*, Kent D. Stocker ("Stocker") was convicted of the offense of Harassment, in violation of HRS § 711–1106(1)(a) (Supp.1998).[2] 90 Hawai'i at 87, 976 P.2d at 401. On June 20, 1997, Stocker visited his ex-wife's parent's home in Pearl City to give his eleven-year-old son ("Son") a birthday card. *Id.* at 87–88, 976 P.2d at 401–02. Although his ex-wife obtained "full custody" of Son and their other child ("Daughter"), Stocker was permitted certain visitation rights. *Id.* at 87, 976 P.2d at 401. Upon arrival, Stocker did not attempt to enter the residence, but conversed with Son and

Daughter from the doorway. *Id.* at 88, 976 P.2d at 402. According to Son's trial testimony, Stocker then flung birthday cards and a money envelope into Son's chest. *Id.* It is unclear whether Stocker also punched Son in the chest, and, if so, whether the punch was out of aggression or playfulness. *Id.* Stocker asked Son to go home with him, but Son declined and left to watch television while Stocker spoke with Daughter. *Id.* Stocker later called Son back to the door, but Son refused to comply. *Id.* Son testified that Stocker then yelled at him and slapped him in the face with an open hand. *Id.* The slap did not leave a bruise or mark on Son's face. *Id.*

The family court concluded that the prosecution disproved Stocker's parental discipline defense beyond a reasonable doubt because the slap in the face was not "reasonably proportional" to Son's repeated refusal to go back to the door to talk to Stocker. *Id.* at 89, 976 P.2d at 403 (emphasis removed). On appeal, we reversed the family court's judgement of conviction. *Id.* at 96, 976 P.2d at 410. We opined, in relevant part, that

> even viewing the evidence in the light most favorable to the prosecution, the inference is inescapable, the use of force being legally justifiable—by legislative mandate—in the context of parental discipline, that the slap did not constitute an unreasonable, excessive, or disproportionate use of force. .... Although there was no apparent danger to [Son] at the time, we cannot agree with the family court's assessment, that, as a matter of law, a single, mild slap to the face is not "reasonably proportional" to a child's refusal to come when repeatedly directed to do so.

*Id.*

*Stocker* is not controlling because it involves conduct obviously on the lower end of the spectrum of corporal punishment that will not, as a matter of law, constitute abuse. Indeed, precluding one mild, open-handed slap to the face in response to repeated and

---

**2.** HRS § 711–1106(1)(a) (Supp.1998) provides that "[a] person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person ... [s]trikes, shoves, kicks, or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact...."

deliberate disregard of a parent's command to come forward would, in effect, outlaw virtually any use of force in disciplining a child.

In sum, Mother's conduct falls somewhere on the spectrum of corporal punishment between an open-handed slap and six to ten lashes with a belt, as in *Stocker* and *Deleon*, and the wanton beatings displayed in *Crouser, Miller*, and *Tanielu.* By holding as it does today, the plurality has narrowed the gap and thereby restricted the realm reserved for the trier of fact. Indeed, henceforth, where a parent losses control over a child's repeated and prolonged deception about failing to attend tutoring sessions which contributed to poor performance in school, that parent is permitted, *as a matter of law,* to respond in the fashion Mother did here.

## B. Sufficiency of the Evidence

In my view, the proper question is whether the prosecution adduced sufficient evidence to disprove Mother's parental discipline defense. As mentioned, the parental discipline defense authorized Mother to use force against Daughter if:

(a) The force [wa]s employed with due regard for the age and size of [Daughter] and [wa]s reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) The force used [wa]s not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

HRS § 703–309(1) (1993). "Because the requirements of HRS § 703–309(1) are set out in the conjunctive, rather than the disjunctive, the prosecution needed only to disprove one element beyond a reasonable doubt to defeat the justification defense." *Crouser,* 81 Hawai'i at 11, 911 P.2d at 731.

Here, the record indicates that Daughter was performing poorly in school. On the day of the incident in question, Daughter deliberately failed to bring home her report card despite Mother's repeated reminders. Mother subsequently had Daughter write her

grades down on a piece of paper, and Daughter revealed that she had received four "C's," one "D," and an "Incomplete." Mother then surmised that Daughter's grades resulted from her failure to attend tutoring. Daughter confirmed that she had been skipping tutoring sessions and hanging out with her friends at Windward City Shopping Center instead. Throughout the conversation Mother grew increasingly incensed over Daughter's poor performance and deception, and (1) struck Daughter with a plastic backpack approximately sixteen inches by twelve inches in size, (2) struck Daughter approximately five times on her left forearm with a plastic hanger, (3) struck Daughter on the top of her left hand with the hard, flat side of a hair brush, and (4) struck Daughter on the knuckles with the plastic handle of a rusted, metal tool. Daughter testified that Mother was taller, heavier, and stronger. Mother admitted that she lost control, and that she was forcefully swinging the various implements.

Viewed in the light most favorable to the prosecution, *see State v. Agard,* 113 Hawai'i 321, 324, 151 P.3d 802, 805 (2007) (stating that "[t]he test on appeal in reviewing the legal sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the prosecution, substantial evidence exists to support the conclusion of the trier of fact[ ]") (citations omitted) (first alteration in original), the record establishes that Mother, a parent of superior size and strength, lost control and forcefully struck Daughter, among other things, with the blunt handle of a rusted metal tool. Such a blow carries with it an attendant risk of causing "substantial bodily injury"—*i.e.,* a "major avulsion, laceration, or penetration of the skin," or a "bone fracture[.]" *See* HRS § 703–309(1)(b) (excluding from the scope of the parental discipline defense the use of force "designed to cause or known to create a risk of causing substantial bodily injury . . ."); HRS § 707–700 (1993) (defining "substantial bodily injury" to include "major avulsion[s], laceration[s], or penetration[s] of the skin[,]" or "bone fracture[s]"). The fact that Daughter did not actually suffer such an injury is fortunate, but not determinative.

Because I would hold that there is sufficient evidence in the record to sustain the jury's verdict, I next address Mother's second point of error.

## C. The Allen–Like Instruction

Mother's second point of error contends that the family court's response to the jury's communication that it was deadlocked constituted an improper *Allen* instruction. However, I believe that Mother's argument is without merit to the extent that the trial court's response was in substantial accord with the response expressly recommended by this court in *State v. Fajardo,* 67 Haw. 593, 699 P.2d 20 (1985).

In *Fajardo,* a verbal altercation between Eliseo Fuentes Fajardo ("Fajardo") and Robert John Tavares ("Tavares") led to a fight at the end of which Fajardo stabbed Tavares to death with a knife. *Id.* at 593, 699 P.2d at 21. Fajardo was charged with murder. *Id.* At trial, Fajardo claimed the stabbing was in self-defense. *Id.* at 594, 699 P.2d at 21. During its deliberation, the jury informed the trial court that it was deadlocked. *Id.* The trial court responded as follows:

> Ladies and gentlemen, I am going to at this time give you another instruction. I am going to ask that you continue your deliberations in an effort to agree upon a verdict, and I have additional comments I would like you to consider as you do so.
>
> *If you cannot reach a verdict, this case must be tried again.* Any future jury must be selected in a same manner and from the same source from which you were chosen. There is no reason to believe that this case could ever be submitted to twelve men and women more conscientious, more impartial, or more competent to decide it.
>
> During your deliberations, you, as jurors, have a duty to consult with one another and to deliberate with the view to reaching an agreement if you can do so without violating your individual judgment. Although each juror must decide the case for himself, this should be done only after consideration of the evidence with his fellow jurors.
>
> In the course of your deliberations, a juror should not hesitate to re-examine his own views and change his opinion if convinced it is erroneous. *Each juror who finds himself to be in the minority should reconsider his views in the light of the opinion of the jurors in the majority.* Conversely, each juror finding himself in the majority should give equal consideration to the views of the minority.
>
> No juror should surrender his belief as to the weight or effect of the evidence for the mere purpose of returning a verdict.
>
> Applying these additional comments together with all the instructions which I have previously given you, I wil [sic] now ask that you retire once again and continue your deliberations and exercise your very best effort to reach a verdict.

*Id.* at 594–95, 699 P.2d at 21–22 (citing Transcript, December 27, 1983, at 4–5) (emphases in original). The jury subsequently returned a unanimous verdict finding Fajardo guilty of the lesser-included offense of manslaughter. *Id.* at 595, 699 P.2d at 22.

On appeal, this court reversed Fajardo's conviction reasoning that (1) the potential for retrial was not a proper matter for the jury to consider during its deliberations, and (2) the admonition that jurors in the minority should reconsider their views in light of opinions of the jurors in the plurality was "highly problematical." *Id.* at 600, 699 P.2d at 24–25. We expressly hypothesized that "[h]ad the trial court simply repeated an instruction given earlier to the jury on how to go about its deliberations, ... no prejudicial effect would have befallen [Fajardo]." *Id.* at 601, 699 P.2d at 25. In a footnote we provided a specific example of an instruction, reference to which would have been proper:

> A verdict must represent the considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words your verdict must be unanimous.
>
> Each of you must decide the case for yourself, but it is yourduty [sic] to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. In the course of your deliberations,

do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your h onest [sic] conviction as to the weight or effect of evidence for the mere purpose of returning a verdict.

*Id.* at 601 n. 2, 699 P.2d at 25 n. 2 (citing Transcript, December 21, 1983, at 12).

The response recommended by the *Fajardo* court closely resembles the response in the case at bar. When the jury informed the trial court that it was deadlocked, the trial court instructed the jury as follows: "Continue with your deliberations. See page 16 of the jury instructions." Page 16 of the jury instructions reads as follows:

A verdict must represent the considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous.

Each of you must decide the case for yourself, but it is your duty to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violating your individual judgment. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest belief as to the weight or effect of evidence for the mere purpose of returning a verdict.

The instruction in the present case was virtually identical to the instruction recommended in *Fajardo*. Although the trial court in the present case additionally responded, "Continue with your deliberations[,]" that statement merely expressly states what is obviously implied by a bare recitation of a jury deliberation instruction.

I would therefore hold that the trial court's response did not amount to an impermissible *Allen*-like instruction.

## II. CONCLUSION

In sum, I share in the plurality's discomfort with condemning Mother for her actions in the present case. Most assuredly, even the most pious of parents are susceptible to the unique aggravation caused by the disre-spect, disobedience, or deception of their offspring, capable of triggering an uncharacteristic parental reaction. Nevertheless, I respectfully disagree with the plurality's decision to supplant the jury's verdict in the present case and hold that the facts presented cannot, as a matter of law, constitute a case of abuse. In addition, I do not believe that the trial court's response to the jury's communication that it was deadlocked was improper insofar as it mirrored the response recommended by this court in *Fajardo*.

For the foregoing reasons, I would affirm the ICA's August 29, 2006 judgment, which affirms the first circuit court's August 5, 2005 judgment of conviction.