FC-CRIMINAL NO. 04-1-1188 STATE OF HAWAI`I, Plaintiff-Appellee,
v.
GENIEROSE TAILO, Defendant-Appellant and
FC-CRIMINAL NO. 04-1-1187 STATE OF HAWAI`I, Plaintiff,
v.
DERICK LUNA, Defendant
No. 26825
In the Intermediate Court of Appeals of Hawaii.
November 29, 2007.
On the briefs:
Todd Eddins for Defendant-Appellant
Stephen K. Tsushima Deputy Prosecuting Attorney City and County of Honolulu for Plaintiff-Appellee

MEMORANDUM OPINION
RECKTENWALD, Chief Judge, and NAKAMURA, J. and WATANABE, J., concurring and dissenting
Defendant-Appellant Genierose Tailo (Tailo) and her husband, co-defendant Derick Luna (Luna), were each charged with abuse of a family and household member, in violation of Hawaii Revised Statutes (HRS) § 706-906 (Supp. 2002).[1] The complaining witness (CW), who was in first grade at the time of the charged incident, was Luna's daughter from a prior relationship and was Tailo's step-daughter. The CW lived with Luna and Tailo, referred to them as her "parents," and referred to Tailo as her "mom."[2]
Tailo and Luna were found guilty as charged after a jury trial.[3] The Family Court of the First Circuit (family court) sentenced Tailo and Luna to two years of probation, subject to a condition that they each serve 30 days in jail. Tailo appeals from the family court's Judgment entered on September 14, 2004. Luna did not appeal his conviction or sentence.
On appeal, Tailo argues that: 1) the family court erred in admitting statements the CW made to her school's health aide as statements made for purposes of medical diagnosis or treatment, pursuant to Hawaii Rules of Evidence (HRE) Rule 803 (b) (4) (1993); 2) there was insufficient evidence to support Tailo's conviction; 3) the family court erred in excluding evidence of a prior incident in which the CW lied and was punished, which Tailo contends was relevant to her parental justification defense; 4) the family court erred in failing to sua sponte declare a mistrial when the prosecutor asked Tailo why she failed to produce the back scratcher used to discipline the CW, which Tailo claims impermissibly shifted the burden of proof to Tailo; and 5) the prosecutor engaged in repeated acts of misconduct which deprived Tailo of a fair trial.
With the exception of Tailo's third point of error, we conclude that the points of error raised by Tailo lack merit. As to Tailo's third point, however, we agree with Tailo that the family court erred in excluding evidence of the prior incident of lying by the CW, which was relevant to Tailo's parental justification defense. We therefore vacate Tailo's Judgment and remand the case for a new trial.

BACKGROUND

I.
The events leading to Tailo's prosecution were as follows. A student in the CW's first grade class reported to the teacher that the CW had touched another boy's "private" area. The teacher questioned the CW and the boy, and both confirmed the touching. The teacher explained to the CW that this was not appropriate behavior and asked her not to do it again. Later, the teacher saw the CW lift up her shirt and point to her breasts as the boy watched. The teacher admonished the CW and sent her to the principal's office to discuss her behavior.
That night, the teacher sent a note home with the CW advise the CW's parents about what had happened. The note stated:
[The CW] touched a boy's privates twice during class today. She also lifted her shirt to show him her breast. She admitted to doing it when asked. (I saw her lift her shirt.) She and the boy were sent to the office.
The teacher included her home telephone number on the note and invited the CW's parents to call if they had questions.
The CW testified that she did not give the note to her parents when she got home because she was afraid they would get mad. According to the CW, her father, Luna, found the note and became angry. Luna hit the CW on her "bottom" with his hand and a wooden back scratcher.
The CW vacillated on how Tailo had hit her. Initially, the CW stated she could not remember what Tailo had hit her with or where Tailo had hit her. After further questioning, the CW testified that Tailo had hit her with the back scratcher. The CW also stated that Luna hit the CW first and then Tailo hit the CW a little while after Luna had stopped. However, on cross-examination, the CW testified that she was not sure whether Tailo had hit her with the back scratcher and did not remember whether Tailo had hit her with Tailo's bare hand.
The following day at school, the CW showed her teacher a bump on the CW's forehead, but stated she did not know how she got the bump. Later, a student directed the teacher's attention to a bruise on the CW's arm, which the teacher described as a black and blue bruise that appeared to have a thumb print inside. After consulting with the principal, the teacher sent the CW to the school's health aide, Frances Varde, to be examined.
Varde testified that she was a certified medical assistant, having obtained her certification after completing an eighteen-month course at the Medicine School of Hawaii. As part of this course, Varde learned anatomy, physiology, signs and symptoms, and medical terminology as well as how to take vital signs, to administer first aid and C.P.R., and to treat wounds. Varde had been a medical assistant for twenty years and had spent most of that time helping doctors, primarily pediatricians, in the treatment of patients. Varde had served as a school health aide for five years, with the most recent two and a half years spent at the CW's school. As a school health aide, Varde took care of students' injuries or illnesses, cleaned and bandaged their wounds, took their temperatures, gave medication, recorded information, and contacted parents if the students needed to go home.
Typically, a teacher would refer a student who was sick or injured to Varde by sending the student to the health room with a note on the student's health card containing a general description of the problem. For a student with an injury, Varde testified that she would ask the student questions to determine exactly how the injury happened as well as when it happened and where it hurts. These questions were necessary for Varde to diagnose and treat the injury accurately, determine the injury's severity, and decide whether she needed to call the student's parents and send the student home or to take the student to a doctor.
Varde testified that she recalled a day when the CW came in with her health card, which contained a request by the CW's teacher that Varde "check and document some bruises" on the CW. Upon examination of the CW, Varde saw extensive bruising on the CW's body, not only on the CW's arm and forehead, but from her left shoulder blade all the way down her back and on her buttocks. Varde described the bruises on the CW's back as "some bluish bruises, reddish-blue bruises from her left shoulder blade area down to her rib area." Varde stated that when she saw the bruises
I was pretty shock, because there was a lot, and it wasn't just a little typical bruise on the knee when they trip or on the elbow. This was in places where it wasn't normal, and there was a lot. So it was pretty shocking to me. And, you know, the first thing came to my mind was, you know, she was hit.
It was the worst case of bruising that Varde had seen on a child in her twenty years as a medical assistant.
The CW was reluctant to tell Varde what had happened, and so the CW's teacher took the CW aside. The CW was crying and said she was scared because she was supposed to keep things that happened at home "quiet" and "private." The teacher promised to keep the CW safe. After speaking to her teacher, the CW told Varde and others present that "she was hit many times with a back scratcher by her mom and her dad." Varde testified that "[the CW] said she was hit a lot of times, and it was hard. So hard that the back scratcher broke." The CW indicated that she was afraid to go home because she was not supposed to talk about the family's personal business.
The CW was taken to the hospital by ambulance. Varde accompanied the CW at the CW's request. They stayed at the emergency room for about two hours, where the CW was examined by a doctor. Varde testified that neither she nor the hospital provided any treatment to the CW for her injuries. The prosecution introduced two Polaroid photographs taken of the CW at the hospital. Varde testified that the photographs were "a little blurry" and did not show the CW's bruises too well. Varde stated that the bruises "looked worse in person."

II.
Luna and Tailo each testified in their own defense. Luna testified that prior to the charged incident, the level of discipline he imposed on the CW depended on the nature of her wrongdoing. Luna used a sliding scale from grounding, to taking away privileges, to spanking on the CW's bottom if the other methods failed. Luna's goal in disciplining the CW was to teach her right from wrong because he loved her and did not want her to make the same mistakes later in life.
On the day of the incident, the CW did not follow her normal practice of turning over her book bag to Luna, and instead only showed him selected items from the bag. From past experience, Luna suspected the CW was hiding something. He eventually found the teacher's note after looking through the bag. Luna read the note and asked the CW whether she wanted to tell him what happened at school. The CW was evasive, so Luna called the CW's teacher, who confirmed that the CW had engaged in the inappropriate behavior reflected in the note. Luna told the CW that he had spoken to her teacher. The CW denied that anything had happened and said that her teacher had lied and that the note was a lie.
Luna became increasingly upset because he had given the CW numerous opportunities to tell the truth, but she persisted in lying. According to Luna, he felt it was necessary to discipline the CW to let her know that lying was wrong and that touching a boy's privates was inappropriate. Luna explained to the CW his reasons for disciplining her both before and while he punished her. Luna testified that he began disciplining the CW by spanking her with his hand, but then used a back scratcher to hit her when she continued to lie. Luna stated that the back scratcher was about 13 inches long and made of bamboo.
Luna asserted that his hitting the CW with the back scratcher "wasn't hard at all" and described the degree of force he used as "just taps." Luna stated that he switched from using his hand to using the back scratcher to spank the CW because his hand was not having the desired effect: "Because my hand actually wasn't really mean, I was whacking her, and it's like, you know, nothing. So I just gave her taps with the back scratcher." Luna testified that he hit the CW with the back scratcher "[flour, five, six time[s] maybe at the most.'
Luna testified that while he was spanking the CW with his hand and the back scratcher in the bedroom, Tailo was not present, but was ill and resting in the parlor. After he finished disciplining the CW, Luna sent the CW to her room and then went to the parlor to discuss the matter with Tailo. Luna and Tailo decided to call the CW into the parlor and have the CW describe what she had done in school. Luna testified that when the CW appeared to be stalling in answering questions about where she touched the boy or how she had lifted her shirt, Tailo twice spanked or slapped the CW in the arm or shoulder, with an open hand, to prompt the CW to answer.
Tailo's testimony about her role in disciplining the CW that evening was generally consistent with Luna's testimony. Tailo testified that she was sleeping in the parlor after taking medication for her illness when she heard the CW crying. Tailo knew by the way that the CW was crying that Luna had already given the CW spankings or "lickings." Luna sent the CW to her room and came to the parlor to talk to Tailo. Luna explained the situation and showed Tailo the note from school. At Tailo's suggestion, Luna called the teacher and Tailo joined the conversation on another line. The teacher explained what happened in school, indicated that she thought it was just kids being kids, and offered to further discuss the matter with the CW in school the following day.[4]
According to Tailo, after speaking with the teacher, Luna took time to smoke a cigarette before they called the CW into the parlor. Tailo stated that during the series of questions they asked the CW, Tailo slapped the CW twice to get her attention when she appeared to be stalling:
Q. And why did you slap her twice?
A. The both times, both times was because she stalled. She was stalling to answer the question. She wasn't listening. Like she was just like  well, I'm not listening to my daddy. It wasn't  she wasn't there. She wasn't paying attention. It was just to get her attention. And it  to me, it wasn't even a slap. It was just tapping her on the side.
Q. And when does the second slap happen?
A. Maybe few minutes later when we asked her another question, and she did the same thing. It was a lot of like ah, ah, ah, um, um, um, and just really blank stares like she didn't know what we were talking about.
Tailo denied spanking the CW or using the back scratcher to hit the CW. Tailo stated that the back scratcher was not used after she slapped or tapped the CW to get her attention. When asked by the prosecutor where the CW's bruises came from, Tailo responded, "Probably from the back scratcher, `cause it was not from my slap or tap."

DISCUSSION

I.
Over Tailo's objection, Frances Varde, the health aide for the CW's school, testified that the CW stated that: 1) "she was hit many times with a back scratcher by her mom and her dad"; 2) "she was hit a lot of times, and it was hard. So hard that the back scratcher broke"; and 3) "they hit [her] so hard the back scratcher broke." Tailo argues that the family court erred in admitting the CW's statements to Varde as statements for purposes of medical diagnosis or treatment, pursuant to HRE Rule 803(b)(4). We disagree.
HRE Rule 803(b)(4) provides:
Rule 803 Hearsay exceptions; availability of declarant immaterial. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
....
(b) Other exceptions.
....
(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
The CW testified that her teacher sent her to the health room to see Varde after discovering the bruise on the CW's arm. The CW carried her health card, the standard procedure followed when a student was sent to the health room with a sickness or injury. Varde had seen the CW in the health room on numerous occasions. Varde was a certified medical assistant with extensive experience in assisting pediatricians and serving as a school health aide.[5] Her responsibilities as a school health aide included diagnosing and treating students sent to her with injuries and determining whether additional medical care was required. The CW's statements that are challenged by Tailo were made in response to questions by Varde about how the CW's injuries had occurred. Varde testified that she needs to know how a student's injury occurred in order to determine the severity of the injury and to diagnose and treat the student accurately.
We conclude that the prosecution laid a sufficient foundation for the admission of the CW's statements under HRE Rule 803(b)(4) and that the family court did not err in admitting the statements pursuant to the rule. The context in which the CW's statements were made show that they were made for purposes of medical diagnosis or treatment. The CW was given her health card and told by her teacher to go to the school's health room to see Varde after the teacher noticed injuries on the CW. The evidence indicates that the CW understood she was being sent to Varde for treatment of her injuries, and thus the CW had a strong motive to be truthful. See Commentary to HRE Rule 803 (1993) ("Statements made for purposes of treatment are admitted `in view of the patient's strong motivation to be truthful.'" (quoting Fed. R. Evid. 803(4), Advisory Committee's Note)). From the perspective of a six-year-old child in first grade,[6] a visit to the health room for examination by the school's health aide would be comparable to a visit to a doctor's office for examination by a doctor.
The CW's statements described the "inception or general character of the cause or external source" of her symptoms. HRE Rule 803(b)(4). Moreover as Varde explained, it is necessary for Varde to obtain information about how an injury occurred in order to properly diagnose and treat the injury, determine its severity, and decide whether further medical attention is required. Thus, the CW's statements to Varde were "reasonably pertinent to diagnosis or treatment." Id.
We reject Tailo's claim that the CW's identification of Tailo and Luna as the source of the CW's injuries was not reasonably pertinent to the CW's diagnosis or treatment and therefore not admissible under HRE Rule 803(b)(4). See State v. Sullivan, 931 P.2d 1109, 1112 (Ariz. Ct. App. 1996) (holding that in cases of child abuse, the child's identification of the abuser is pertinent to diagnosis and treatment because effective treatment may require that the child avoid contact with the abuser); United States v. George, 960 F.2d 97, 99-100 (9th Cir. 1992); United States v. Joe, 8 F.3d 1488, 1493-95 (10th Cir. 1993).[7]
We also reject Tailo's claim that the admission of the CW's statements to Varde violated Tailo's right to confrontation under Crawford v. Washington, 541 U.S. 36 (2004). The CW testified at trial and was available for cross-examination by Tailo regarding the challenged statements. See id. at 59 n.9. Accordingly, Crawford is inapposite.

II.
Contrary to Tailo's contention, there was sufficient evidence to support her conviction. Among other things, the CW testified that Tailo hit her with the back scratcher; Varde testified that the CW stated that Tailo and Luna hit the CW many times with the back scratcher and that the CW was hit hard, so hard that the back scratcher broke; and Varde testified that the bruising on the CW's body was the worst that she had seen in twenty years as a medical assistant. When viewed in the light most favorable to the prosecution, State v. Richie, 88 Hawai`i 19, 33, 960 P.2d 1227, 1241 (1998), there was substantial evidence to support Tailo's conviction, including substantial evidence to disprove Tailo's parental justification defense beyond a reasonable doubt.[8]
State v. Matavale, 115 Hawai'i 149, 166 P.3d 322 (2007), is distinguishable. In Matavale, the Hawai`i Supreme Court held that the physical discipline imposed by a mother on her 14-year-old daughter for lying to, misleading, and disrespecting the mother fell within the parameters of the parental justification defense. Id. at 165, 168, 166 P.3d at 338, 341. The court determined, as a matter of law, that the evidence was insufficient to establish the mother's guilt on the charge of abuse of a family or household member and reversed the mother's conviction. Id. at 168, 166 P.3d at 341.
The supreme court, however, made clear in Matavale, that its holding was based on the particular circumstances of the case, and that the question of whether the prosecution has elicited sufficient evidence to prove beyond a reasonable doubt that the defendant's conduct did not come within the scope of the parental justification defense must be decided on a case-by-case basis. The court stated:
Clearly, there is no bright line that dictates what, under all circumstances, is unreasonable or excessive corporal punishment. Rather, the permissible degree of force will vary according to the child's physique and age, the misconduct of the child, the nature of the discipline, and all the surrounding circumstances. It necessarily follows that the question of reasonableness or excessiveness of physical punishment given a child by a parent is determined on a case-by-case basis and is dependent upon the particular circumstances of the case.
Id. at 165, 166 P.3d at 338.
Unlike in Matavale, the complaining witness in Tailo's case was apparently six years old[9] at the time of the charged incident. Under the parental justification defense, the child's age, the child's stature, and the nature of the injuries inflicted must be considered in determining whether the force used was reasonable. Id. at 164, 166 P.3d at 337. In Tailo's case, we cannot say, as a matter of law, that when viewed in the light most favorable to the prosecution, there was insufficient evidence to disprove Tailo's parental justification defense. Instead, we conclude that the question of whether Tailo's conduct fell within the scope of the parental justification defense was a question for the jury to decide.

III.

A.
During a hearing on motions in limine on the day before trial, Luna's counsel stated that Luna planned to offer evidence of a prior incident in which the CW lied about being sick at school and was disciplined, in support of Luna's parental justification defense.
THE COURT: Okay. Then that brings us to specific instances of conduct of untruthfulness. Do you feel that you have some that you would offer into evidence?
[LUNA'S COUNSEL]: Well, the only specific instance of conduct of untruthfulness is at [sic] previous event. The complaining witness supposedly lied about being sick at school, called Mr. Luna and asked that he pick her up  pick her up from school. And basically, our defense is that she has lied in the past. The reason why Mr. Luna has disciplined her in the past for lying. She continued to do it on [the date of the charged incident], when he knew  when she knew it was wrong and that explains the reason and level of discipline Mr. Luna felt appropriate at this time.
The prosecutor objected to this evidence, arguing that it was impermissible character evidence under HRE Rule 404(b) (Supp. 2006) and more prejudicial than probative under HRE Rule 403 (1993). The family court then asked Tailo's counsel for his views on the evidence. Tailo's counsel responded that he was not aware of the specific incident, but joined in Luna's request that evidence of the prior incident be admitted.
The family court excluded the evidence of the prior incident. The court reasoned that the risk of prejudice that the evidence would portray the CW as having the propensity to lie  outweighed whatever probative value the evidence might have.

B.
On appeal, Tailo argues that the family court erred in excluding the evidence of the prior lying incident because it was relevant to prove that the level of physical discipline imposed on the CW during the charged incident was reasonable. Tailo claims:
Evidence of [the CW's] prior history of lying was "reasonably related" to the level of force imposed in this case. The evidence indicated that [the CW] had been previously disciplined for misconduct and that the type of discipline depended on the type of misconduct. The discipline would range from grounding to spanking. Had the evidence of the prior incident of lying been allowed the jury would have heard that [the CW] had lied before and been disciplined for it. Because of the court's ruling, the jury had no opportunity to hear what kind of discipline was imposed for that prior incident and to decide for itself whether the level of discipline imposed in this case was therefore justified.
We agree with Tailo that the evidence proffered by the defense was relevant and that the family court erred in excluding it. The Hawaii Supreme Court has interpreted the statute establishing the parental justification defense as requiring that the force used "be both reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient." State v. Crouser, 81 Hawaii 5, 12, 911 P.2d 725, 732 (1996) (emphasis added). Evidence that the CW had previously been disciplined for misconduct, the nature of the prior misconduct, and the type of discipline imposed, was relevant to whether the force used against the CW in this case was reasonably proportional to the CW's misconduct.
We conclude that the family court's error in excluding evidence of the prior lying incident was not harmless beyond a reasonable doubt. In contrast to Luna, who admitted spanking the CW with his hand and repeatedly hitting her with the back scratcher, the evidence regarding Tailo's role in causing the CW's injuries was in dispute. The CW's testimony about Tailo's role was equivocal. In addition, both Tailo and Luna testified that Tailo did not hit the CW with the back scratcher but only slapped or tapped the CW twice to get her attention after Luna had already given the CW "lickings." Under these circumstances, we cannot say that as to Tailo, the exclusion of the prior lying incident, which was relevant to her parental justification defense, was harmless error.

IV.
Because we are vacating Tailo's conviction and remanding for a new trial, we only briefly address Tailo's remaining claims. Tailo contends that the family court erred in failing to sua sponte declare a mistrial when the prosecutor asked Tailo why she failed to produce the back scratcher used to discipline the CW, which Tailo claims impermissibly shifted the burden of proof to Tailo. We conclude that the family court did not err in failing to declare a mistrial. When Tailo objected to the prosecutor's question about why Tailo had left the back scratcher at home, the family court precluded the prosecutor from pursuing that line of inquiry. At the close of the evidence, the family court instructed the jury that the questions or the remarks of counsel are not evidence, that the defendant is presumed innocent, and that the prosecution has the burden of proving every material element of the charged offense beyond a reasonable doubt. Under these circumstances, a mistrial was not required.
Tailo further contends that the prosecutor engaged in misconduct which deprived Tailo of a fair trial based on: 1) comments made by the prosecutor in opening statement and closing argument; and 2) remarks made by the prosecutor to comfort the CW during the CW's direct examination. We note that Tailo did not object to these matters which she now contends amounted to prosecutorial misconduct. Although we do not necessarily endorse the prosecutor's actions, we reject Tailo's claim that the challenged remarks deprived her of a fair trial. On remand, Tailo will have the opportunity to raise objections to any actions or comments of the prosecutor Tailo believes are improper.

CONCLUSION
The September 14, 2004, Judgment of the family court is vacated and the case is remanded for a new trial.

CONCURRING AND DISSENTING OPINION
BY WATANABE, J.
I concur with the majority's decision to vacate the judgment of the Family Court of the First Circuit and remand this case for a new trial. For the following reasons, however, I disagree that the out-of-court statements that the complaining witness (CW) made to Frances Varde (Varde), the school health aide, were properly admitted into evidence pursuant to Hawaii Rules of Evidence (HRE) Rule 803(b)(4)[1] as statements made for the purposes of medical diagnosis or treatment.
First, I seriously question whether a school health aide, acting alone, is qualified or authorized to make medical diagnoses or provide medical treatment so that statements made to the aide would constitute an exception to the no-hearsay rule under HRE Rule 803(b)(4).
Second, my review of the record on appeal indicates that CW's statements to the health aide were not made for the purposes of medical diagnosis or treatment but in response to questions posed during an investigation into the circumstances of CW's bruises.
It was undisputed that CW's first-grade teacher, after consulting with the school's principal, sent CW to the health room to "check and document some bruises that [CW] had." Varde testified that after examining CW's bruises, she asked CW what happened; however, CW repeatedly responded that "she didn't know." Varde then called the principal to come and witness what she saw, and after seeing CW's bruises, the principal summoned the school's counselor. Thereafter, Varde, CW, the principal, and the counselor walked to the principal's office, where they were joined by CW's teacher, a police officer, the vice-principal, and later, some paramedics summoned by the police officer.
According to Varde,
[a]fter we went into the principal's office, the teacher came in and took [CW] aside, and she told [CW] how important it was for [CW] to tell what's happening, because we wanted to help her. That's when [CW] admitted that she was hit many times with a back scratcher by her mom and her dad.
CW's teacher similarly testified that when she walked into the principal's office after being summoned by the principal,
[CW] didn't say anything. And I said, at first, and I said well  I said, are  do you want to talk to me? And she said, yes. So we walked just out of the principal's office and around the corner where other people were. And I said  and so I hugged her, and I said, are you okay? And she was crying, and she said she was scared.
. . . .
. . . And I said  I said, I promise you, [CW], I will keep you safe. If you want to talk to just me, and you don't want me to say anything, I won't. But I promise you we can go back in there, and you can talk to them and tell them what happened, and I will keep you safe. And she agreed to that. And we walk back in there, and she told them what happened, and she sat on my lap, I think.
According to CW's teacher, CW was "scared" about "telling stuff that . . . happened at home that she was suppose [sic] to keep quiet, keep private, personal business." CW's teacher also testified as follows:
[CW] was afraid. And actually, and the police officer asked [CW] if she was afraid to go home, and she said yes. And at that point, they decided to take her to the hospital.
The record also reveals that CW was never treated for any injuries. Varde acknowledged that she did not treat CW because "[t]here were no cuts or no  no blood. Like she didn't just fall down and get scraped. So there was nothing really I can do . . . to treat her." Varde also stated that "[a]t the hospital, they didn't do any treatment either." Asked by defense counsel why no treatment was provided to CW, Varde responded, "We had  we wanted to refer to the police. So that's why."[2]
The record thus indicates that CW's statements implicating her father and step-mother as responsible for her bruises were not made until she was in the school principal's office, sitting on her teacher's lap, and surrounded by adult authorities that included her school's principal, vice-principal, counselor, and health aide, as well as a police officer and paramedics who were called to the school. CW was questioned, not only by the health aide, but also by the other authorities, including the police officer. Moreover, the questions to CW were posed to detect how and at whose hands CW was bruised, rather than to obtain information for purposes of diagnosing and treating CW.
In State v. Huntington, 216 Wis. 2d 671, 575 N.W.2d 268 (Wis. 1998), the Supreme Court of Wisconsin declined to extend its equivalent of HRE Rule 803(b)(4) to statements given to counselors or social workers, on grounds that the nature of their examination is more investigative in nature than medicinal.
We decline . . . to apply the hearsay exception for statements made for medical diagnosis or treatment to statements made to counselors or social workers. Such an expansive application of the doctrine would strain the traditional grounds for the exception. Receipt of proper medical diagnosis and treatment requires doctors to obtain basic information about a patient implicating that diagnosis and treatment. The doctor is focused on diagnosis and treatment of the individual, "not on the process of providing larger social remedies aimed at detecting abuse, identifying and punishing abusers, and preventing further mistreatment, which involves skills and social intervention lying beyond the expertise of doctors." 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 442, at 464 (2d ed. 1994).
Huntington, 216 Wis. 2d 671, 695, 575 N.W.2d 268, 278 (citation omitted).
In this case, I would not extend the exception for medical diagnosis and treatment contained in HRE Rule 803(b)(4) to the statements elicited from CW during questioning by Varde in the principal's office.
NOTES
[1] At the time of the alleged offenses, Hawaii Revised Statutes (HRS) § 709-906 (Supp. 2002) provided in relevant part:

(1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member . . . .
For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.
[2] To simplify matters, we will hereafter refer in this memorandum opinion to Defendant-Appellant Genierose Tailo (Tailo) and co-defendant Derick Luna (Luna) as the "parents" of the complaining witness (CW).
[3] The Honorable Patrick W. Border presided.
[4] Tailo's testimony about when the teacher had been called differed from Luna's. Luna testified that he called the teacher before he spanked the CW with his hand and the back scratcher. Tailo testified that the teacher was called after Luna had already given the CW spankings.
[5] Frances Varde estimated that she had treated thousands of children for injuries during her career.
[6] Varde testified that she believed the CW was six years old at the time the CW made the challenged statements. The CW's testimony established that the CW was in first grade at the time of the charged incident and that the CW was in second grade and was seven years old when she testified at trial.
[7] Tailo does not argue on appeal that the CW's statements to Varde did not qualify under Hawaii Rules of Evidence (HRE) Rule 803(b)(4) (1993) because Varde was a medical assistant and not a physician. In any event, we conclude that in light of Varde's position as the school's health aide and her medical training and experience, her status as a non-physician did not prevent the CW's statements to Varde from qualifying under HRE Rule 803(b)(4). HRE Rule 803 (b) (4) is identical to Federal Rules of Evidence (FRE) Rule 803(4). The Advisory Committee's Note to FRE Rule 803(4) states in relevant part: "Under [FRE Rule 803(4)] the statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included." In addition, under an evidentiary rule identical to HRE Rule 803(b)(4), Texas courts have allowed statements made to a variety of non-physicians to qualify as statements made for purposes of medical diagnosis or treatment. See Bautista v. State, 189 S.W.3d 365, 369 (Tex. App. 2006) (citing cases allowing a social worker, nurse, play therapist (under supervision of a licensed psychologist), paramedic, and psychologist to testify to hearsay statements made to them under the Texas rule identical to HRE Rule 803(b)(4)).
[8] The parental justification defense is set forth in HRS § 703-309(1) (1993) and provides:

§ 703-309 Use of force by persons with special responsibility for care, discipline, or safety of others. The use of force upon or toward the person of another is justifiable under the following circumstances:
(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and
(b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.
[9] See footnote 6, supra.
[1] Hawaii Rules of Evidence Rule 803(b)(4) states as follows:

Hearsay exceptions; availability of declarant immaterial. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(b) Other exceptions.
. . . .
(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
[2] Employees or officers of public schools are subject to criminal prosecution if they fail to immediately report suspected child abuse to the proper authorities. See Hawaii Revised Statutes chapter 350 (1993 & Supp. 2006).